**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**Brian Scott CLAYTON, Defendant– Appellee.**

No. 08SA353.

Supreme Court of Colorado, En Banc.

May 18, 2009.

Daniel H. May, District Attorney, Fourth Judicial District, Amy C. Fitch, Senior Deputy District Attorney, Colorado Springs, Colorado, Attorneys for Plaintiff–Appellant.

Gentry and Prudek, LLP, Elvin L. Gentry, P.C., Marla Prudek, P.C., Colorado Springs, Colorado, Attorneys for Defendant–Appellee.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

The prosecution brings this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–2–102(2), C.R.S. (2008), challenging the trial court's order suppressing statements made by Defendant Brian Scott Clayton to police officers after he signed a written waiver of his *Miranda* rights. The trial court found that his waiver was not valid and granted Clayton's motion to suppress. After reviewing the record and the video of the recorded interview, we conclude that Clayton validly waived his *Miranda* rights and that his statements should not have been suppressed. Accordingly, we reverse the trial court's suppression order and remand for further proceedings.

## II. Facts and Procedural History

Witnesses attending a house party contacted police to report that, after stabbing two people, a suspect, who possibly had the last name Clayton, left the scene in a white Ford Explorer. The report was broadcast to an officer on patrol who, shortly thereafter, spotted a white Ford Explorer with a license plate registered to an owner with the last name Clayton. The officer pulled the vehicle over, identified the driver as twenty year old Brian Clayton, and observed blood on Clayton's hands and clothes. The officer arrested Clayton, informed him that he was being arrested in relation to the reported stabbing, and advised him of his *Miranda* rights, reading them verbatim from a *"Miranda* card." Clayton stated that he understood his rights and wanted to talk to the police. Instead of

questioning him at that time, the officer drove Clayton to the police station. The officer did not discuss the incident with Clayton during the approximately fifteen minute drive. The officer testified that at some point before arriving at the police station, Clayton said, "Those guys jumped me; I just defended myself."

At the police station, Clayton met with Detective Losasso, who asked if Clayton had been advised of his *Miranda* rights. Although Clayton stated that he had been so advised, Losasso advised him again of his *Miranda* rights, reading them from a standard form. After Clayton again expressed that he understood his rights, Losasso presented a written copy of the *Miranda* rights for Clayton to sign as a waiver. Clayton moved to sign the waiver but then hesitated, asking "What do you mean 'talk to us?' " and stating "I mean, I have no problem, it's just, you said this could be used against me in court." Losasso responded that this was Clayton's opportunity to tell his side of the story.

As the discussion continued, Clayton asked to call his mother to "ask her if I should sign yes or no." Losasso responded that he did not have a telephone and that the decision of whether to waive his rights and give a statement was "up to you but, you know, um, if you don't want to sign it, that's your right." Clayton subsequently signed the waiver and made several incriminating statements. For example, Clayton admitted that he was at the party with the victims, he had pulled a knife, and he had thrust his knife in the direction of the victims. While he remained adamant that he acted in self-defense, some of his statements were inconsistent and contradicted statements given by other witnesses. The prosecution later charged Clayton with two counts of first degree assault[1] and four counts of a violent crime.[2]

Prior to trial, Clayton moved to suppress his statements, alleging that they were made without adequate advisement of his *Miranda* rights, that they were involuntary because they were the product of coercion, and that the police had violated a statutory require-

ment permitting him to call his family. The trial judge found that Losasso's actions "clearly were coercive to this young man," and expressed several concerns, including that Clayton was not allowed to call his mother, that he "looked like he was under pressure [and] uncomfortable in the situation," that Clayton "really rushed into things without stopping to take the time," and that Losasso should have explained further what he intended to discuss. For these stated reasons, the trial court found Clayton's waiver of his *Miranda* rights invalid and granted the motion to suppress. The prosecution appealed the trial court's suppression order.

### III. Analysis

The prosecution argues that Clayton's statements should not be suppressed because (1) Clayton's waiver was knowing, intelligent, and voluntary; and (2) even if the police violated section 16–3–401(1), C.R.S. (2008), which requires officers to allow an arrestee to contact family "at the earliest possible time after arrival at the police station," suppression is not an appropriate remedy for such a violation. We agree with the prosecution and therefore reverse the suppression order.

### A. Validity of Waiver.

Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a suspect must be advised of and waive certain constitutional rights before being subjected to a custodial interrogation. Determining the validity of a *Miranda* waiver "requires a two-step analysis: first, the court must determine whether the defendant was adequately warned of his privilege against self-incrimination and his right to counsel; and, second, the court must determine whether the defendant knowingly, intelligently, and voluntarily waived these rights." *People v. Chase*, 719 P.2d 718, 720 (Colo. 1986). When the validity of a *Miranda* advisement is questioned, the prosecution bears the burden of proving the validity of a *Miranda* waiver, and must demonstrate by a

---

**1.** § 18–3–202(1), C.R.S. (2008).

**2.** § 18–1.3–406(2)(a), C.R.S. (2008).

preponderance of the evidence that the waiver was made knowingly, intelligently, and voluntarily. *People v. Mejia–Mendoza*, 965 P.2d 777, 780 (Colo.1998).

■ In the present case, it is undisputed that Clayton was advised of his Miranda rights, twice verbally and once in writing. However, the trial court concluded that the prosecution had not met its burden of proving a valid waiver and granted the motion to suppress. We review the validity of a *Miranda* waiver under a de novo standard. *People v. Matheny*, 46 P.3d 453, 462 (Colo. 2002) (citing *People v. Owens*, 969 P.2d 704 (Colo.1999), and *People v. Valdez*, 969 P.2d 208 (Colo.1998)). Under this standard, we conclude that Clayton's waiver was knowing, intelligent, and voluntary, and therefore valid.

### 1. Clayton was adequately advised of his *Miranda* rights.

■ Turning to the first inquiry, we find that Clayton was sufficiently advised of his *Miranda* rights. Clayton argues that Losasso's second verbal warning was inadequate because it was conducted "in a perfunctory way," emphasizing that Losasso quickly read the rights from the form and leaned over as if uninterested. Clayton also complains that Losasso failed to read the last sentence containing the question, "do you wish to talk to us/me now?" However, there is no requirement that *Miranda* advisements be conducted with specific language. Losasso read Clayton his rights verbatim from a standard form and Clayton acknowledged that he understood them. Although he did not read the last line, he conveyed its meaning because, according to the trial court, Losasso indicated, "through his actions" of presenting Clayton with the written waiver, the question of whether Clayton wished to speak to him. We therefore conclude that the content of Losasso's verbal advisement at the police station, particularly in combination with the written *Miranda* form, was adequate to advise Clayton of his rights.

In addition to finding Losasso's verbal advisement sufficient, we note that the police advised Clayton of his rights twice more; the arresting officer had advised him less than thirty minutes before Clayton spoke to Losasso, and Losasso provided him with a written copy of his rights. Because each of the advisements was individually adequate, we conclude that the combination of the three sufficiently informed Clayton of his *Miranda* rights.

### 2. Clayton's waiver was knowing, intelligent, and voluntary.

■ Next, we consider the validity of Clayton's waiver of his *Miranda* rights. The trial court cited several "troubling" factors and concluded from them that Clayton's waiver was not valid. After reviewing the record and considering the totality of the circumstances, *People v. Platt*, 81 P.3d 1060, 1065 (Colo.2004), we reverse.

### i. Knowledge and intelligence

■ We first conclude that the waiver was both knowing and intelligent. The trial court expressed concern that Losasso did not "explain further what was going on in the interrogation." However, police interrogators "have no obligation to inform a suspect of the possible subjects of an interrogation or the facts and circumstances which may be pertinent to his or her decision to talk to police." *People v. Humphrey*, 132 P.3d 352, 358 (Colo. 2006). Additionally, the record reveals that Clayton was actually aware of the subject of the discussion. The arresting officer informed Clayton that he was being arrested in connection with the stabbing. When Clayton inquired about what would be discussed, Losasso responded that he wanted to hear Clayton's side of the story. Although Losasso did not specifically refer to the stabbing incident,[3] it is clear from the context of the discussion, as well as Clayton's repeated unsolicited statements that he "was jumped" and was defending himself, that Clayton was fully aware of the content of "what was going on in the interrogation."

The trial court was also concerned that Losasso did not read the last line of the

---

3. Although not referring to a stabbing, Losasso mentioned that he had heard that Clayton had been in a fight and he wanted to discuss Clayton's side of the story regarding that fight.

*Miranda* warnings contained on the sheet, "having these rights in mind, do you wish to talk to us/me now?" As discussed above, Losasso's verbal advisement was the second of three advisements given to Clayton. After giving the verbal advisement, Losasso presented Clayton with a written copy of the rights. Clayton initialed "yes" next to the form's second question—"having these rights in mind, do you wish to talk to us/me now?"—but not before engaging in a substantive discussion with Losasso about it. Clayton was clearly aware of the question and its significance, as evidenced by his two questions: (1) "before I initial and sign the second [question] like, what do you mean 'talk to us?'" and (2) whether he could call his mother to "ask her if I should sign yes or no." The evidence indicates Clayton was aware of and understood the significance of his rights before waiving them.

 Clayton further asserts that his waiver was unintelligent and unknowing because he was intoxicated. There is no evidence of Clayton's blood alcohol content. Assuming for purposes of argument that he was intoxicated, however, that is not a basis for invalidating his *Miranda* waiver. "Intoxication will render a suspect's waiver involuntary when government conduct causes the intoxication" or, if self-induced, when "the suspect was so intoxicated that he or she could not have made a knowing and intelligent waiver." *Platt*, 81 P.3d at 1066; *see also People v. Jewell*, 175 P.3d 103, 106 (Colo. 2008). In determining whether intoxication renders a waiver unknowing and unintelligent, this court considers several factors, including:

> whether the defendant seemed oriented to his or her surroundings and situation; whether the defendant's answers were responsive and appeared to be the product of a rational thought process; whether the defendant was able to appreciate the seriousness of his or her predicament, including the possibility of being incarcerated; whether the defendant had the foresight to attempt to deceive the police in hopes of avoiding prosecution; whether the defen-

dant expressed remorse for his or her actions; and whether the defendant expressly stated that he or she understood their rights.

*Platt*, 81 P.3d at 1066 (citing *People v. Kaiser*, 32 P.3d 480, 487–89 (Colo.2001)).

Considering these factors, we conclude that Clayton's waiver was both knowing and intelligent. The police did not cause his intoxication. Moreover, Clayton appeared oriented to his surroundings and the situation throughout the interview. He gave responsive answers to Losasso's questions, asked articulate questions on his own initiative, and repeatedly asked questions and made statements reflecting that he understood the gravity of his situation and the possibility that he might be incarcerated. In addition, he apparently possessed the foresight to attempt to deceive the officers by initially stating that he had not consumed alcohol when, as he now acknowledges, he had. Finally, Clayton expressly stated that he understood his rights on several occasions. We therefore find Clayton's waiver both knowing and intelligent despite his alleged intoxication.

### ii. Voluntariness

 We also conclude that Clayton's waiver was voluntary. Both Clayton and the trial court place emphasis on the fact that Losasso did not permit Clayton to call his mother, suggesting this denial was coercive conduct. However, while adult defendants do have a right to terminate an interview at any time to contact an attorney, they do not have a constitutional right to call family members. Therefore, Losasso was not constitutionally required to allow Clayton to call his mother. After he notified Clayton that he would not allow a phone call to his family, Losasso once again informed Clayton that he had the right not to sign the waiver and it was "up to you."[4] We find no defect or coercive quality in this statement of Clayton's rights.

 Without identifying any other police conduct as coercive, the trial court expressed concern about the voluntariness of Clayton's

---

4. Losasso did offer Clayton a phone to call his mother twice, later in the interview. Both times, Clayton declined, stating at one point that "she'll be upset."

waiver because Clayton "rushed into things" and "looked very uncomfortable in the situation." Clayton further argues that the situation was coercive because of his discomfort from injuries sustained in the stabbing incident. We conclude that none of these invalidates Clayton's waiver. Even if Clayton had "rushed into" signing the waiver, the fact that a defendant rushes into waiving his rights or makes an otherwise unwise decision does not render his waiver involuntary. *See People v. Pease*, 934 P.2d 1374, 1378 (Colo. 1997) ("A decision is not involuntary because it is unwise, or may prove unwise in hindsight."). Moreover, we note that Clayton did not rush into signing the waiver; he first engaged the detective in a lengthy discussion about whether to sign it.

■■■■ A defendant's subjective discomfort does not render a waiver involuntary. Many reasonable persons would likely appear uncomfortable during a police interview, but such typical discomfort does not suggest that a person cannot execute a knowing, intelligent, and voluntary waiver. Clayton urges us to uphold the suppression order because, he argues, his waiver was not the product of a rational intellect and free will due to the general atmosphere. However, a waiver is involuntary for purposes of *Miranda* only if the police induce the waiver through actual coercive conduct. *See People v. May*, 859 P.2d 879, 883 (Colo.1993) ("[A] waiver of *Miranda* rights resulting in a confession or inculpatory statement is considered to be involuntary only if coercive governmental conduct—whether physical or psychological—played a significant role in inducing the defendant to make the confession or statement."); *see also Platt*, 81 P.3d at 1065.

The United States Supreme Court discussed whether a defendant's *Miranda* waiver could be deemed involuntary and therefore invalid in the absence of coercive police conduct in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In that case, the defendant approached a uniformed police officer on the street and explained that he wanted to confess to a murder. *Id.* at 160, 107 S.Ct. 515. The police advised the defendant of his *Miranda* rights several times. *Id.* The defendant acknowl-

edged that he understood his rights but stated that he wanted to confess to the officers and proceeded to provide several details about the murder. *Id.* Prior to trial, the defendant moved to suppress the statement, alleging that his confession was not voluntary because he had been suffering from a psychotic state and "voices" had directed him to confess. *Id.* at 161, 107 S.Ct. 515. The trial court in that case suppressed the confession on the basis that it was not the product of a "rational intellect and 'free will.'" *Id.* at 162, 107 S.Ct. 515.

The Supreme Court reasoned that the "purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations." *Id.* at 166, 107 S.Ct. 515. There can be no deterrent quality if a finding of a violation is not predicated on some improper police conduct. In addition, the Court was concerned that expanding a defendant's rights to "confess his crime only when totally rational and properly motivated" would force courts to "divine a defendant's motivation for speaking." *Id.* at 165–66, 107 S.Ct. 515. Ultimately, the Court rejected the argument that the voluntariness prong of a *Miranda* waiver should be based upon the subjective state of mind. It reversed the suppression order, finding that "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.* at 170, 107 S.Ct. 515. Here, Clayton has not identified any police conduct that would render his waiver involuntary.

In the absence of coercive police conduct, Clayton questions the "interrogation atmosphere and the evils it can bring," citing *Miranda.* In addition, the trial court expressed concern that Clayton felt some social pressure to cooperate with Losasso. We acknowledge that societal factors can play a role in the decisions of individuals to answer questions and otherwise cooperate when confronted by police. Such pressure to comply with police inevitably increases when a person is in custody at a police station. However, whether a person subjectively feels a social pressure to cooperate with police is not the relevant inquiry to whether that cooperation

is voluntary, and the fact that many individuals accede to police requests does not by itself render a person's compliance involuntary.

Upon our own evaluation of Clayton's interview, we note that Clayton seemed eager to speak with the officers rather than compelled to speak by an uncomfortable situation. Clayton was in the interview room for several minutes before the detective arrived to interrogate him. As soon as he entered the interview room and had his handcuffs removed, Clayton attempted to engage his arresting officer in idle conversation, asking what kind of handcuffs he had been wearing—stating that "they felt like the hinges" rather than those connected by a short chain—and stating, "hopefully I get to go home for my birthday." When he stated once more that he had acted in self-defense, the officer responded that someone would soon arrive to talk to him about it. Clayton then thanked the officer, saying "you've been really nice to me," and the conversation continued. Clayton asked for a mirror and without any provocation began to describe where he had allegedly been injured.

When Losasso entered the room, he read Clayton his rights for the second time, and Clayton again chose to waive them. Throughout the discussion, Losasso did not engage in any coercive conduct; he maintained a conversational tone and did not engage in threats or trickery. Losasso merely repeated the fact that the interview was Clayton's opportunity to tell his side of the story if he chose to do so. Any subjective discomfort Clayton may have been experiencing from the general setting was not caused by government misconduct. His waiver was therefore not coerced. Accordingly, we conclude that Clayton's waiver was voluntary.

For these reasons, we find that Clayton's waiver was knowing, intelligent, and voluntary, and therefore valid.

### B. Violation of Section 16–3–402, C.R.S. (2008)

■ The trial court suppressed Clayton's statements based on its conclusion that his *Miranda* waiver was invalid and did not address Clayton's argument that the statements should have been suppressed under section 16–3–402. Clayton argues that, even if he validly waived his *Miranda* rights, his statements should be suppressed because the police violated section 16–3–402 by not allowing him to call his mother before he signed the *Miranda* waiver. The prosecution, in contrast, asserts that there was no violation of section 16–3–402. We decline to address whether the statute was violated because, even if the police violated section 16–3–402 by not allowing Clayton to call his mother until after his initial custodial interview, such a statutory violation would not warrant suppression of a defendant's statements.

■ Section 16–3–402 states in relevant part:

> Persons who are arrested shall have the right to communicate with ... a member of their family by making a reasonable number of telephone calls or by communicating in any other reasonable manner. Such communication shall be permitted at the earliest possible time after arrival at the ... confinement facility to which such person is first taken after arrest.

§ 16–3–402(1). However, while section 16–3–402 creates a statutory right to call one's family at the earliest possible time after being arrested, there is no such constitutional right. Suppression of evidence is generally reserved to remedy violations of constitutional rights, and is not used to remedy statutory violations. *People v. Shinaut*, 940 P.2d 380, 383 (Colo.1997); *People v. Martinez*, 898 P.2d 28, 31 (Colo.1995) ("We have often held that a statutory or criminal rule violation by itself does not mandate invocation of the exclusionary rule."). Therefore, even if the police did in fact violate section 16–3–402 by not allowing Clayton to call his mother before the interrogation, the proper remedy would not be suppression of his statements.

### IV. Conclusion

The police advised Clayton of his *Miranda* rights three times, twice verbally and once in writing. After these advisements but before waiving his rights, Clayton engaged in a substantial discussion with the interrogating detective regarding the consequence of his po-

tential waiver. Throughout the discussion, the detective maintained a conversational tone and did not exhibit any coercive behavior. Clayton acknowledged that he understood his rights several times and signed the written *Miranda* waiver form. With these facts in mind, we conclude that Clayton's *Miranda* waiver was knowing, intelligent, and voluntary. We furthermore find that any potential violation of section 16–3–402 by the police would not warrant suppression of Clayton's statements. Accordingly, we reverse the trial court's suppression order and remand the case for further proceedings consistent with this opinion.