The **PEOPLE** of the State of Colorado, Plaintiff–Appellant

v.

**Maurice Donte MARTIN,** Defendant–Appellee.

No. 09SA261.

Supreme Court of Colorado, En Banc.

Jan. 19, 2010.

Don Quick, District Attorney, Seventeenth Judicial District, Russell Wentworth, Deputy District Attorney, Brighton, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, Megan M. Downing, Deputy Public Defender, Brighton, Colorado, Attorneys for Defendant–Appellee.

Justice BENDER delivered the Opinion of the Court.

### Introduction

The prosecution brings this interlocutory appeal pursuant to C.A.R. 4.1. The appeal challenges the trial court's order to suppress statements made by defendant Maurice Martin while he was being questioned at the Aurora Police Department regarding a shooting that had taken place the previous day. The trial court granted Martin's motion to suppress, ruling that he did not waive his *Miranda* rights before questioning. However, upon review of the video recording of his interrogation, we hold that, under these particular facts and circumstances, Martin impliedly waived his *Miranda* rights. Although Martin did not express his waiver verbally, his course of conduct indicated a knowing, intelligent, and voluntary waiver of his rights. Martin voluntarily went to the police station to discuss a shooting. He was advised of and acknowledged each of his *Miranda* rights, either by word or by a nod of his head. He answered officers' questions without hesitation for almost an hour and forty-five minutes. Despite breaks in questioning, Martin did not choose to assert his rights until the officers told him that witnesses had identified him as the shooter. Accordingly, we reverse the trial court's suppression order and remand for further proceedings consistent with this opinion.

### Facts and Procedural History

Defendant Martin is charged with two counts of first degree murder and five counts of attempted murder. These charges arise out of a shooting that took place on the afternoon of January 19, 2009, in Aurora, Colorado. According to several witnesses, the shooting was the result of an altercation among a group of young men on a street corner. The altercation escalated and one of the young men fired his weapon, hitting and killing a bystander, Ms. Shunda Jackson. At

least two witnesses identified Martin as the shooter.

The day after this shooting, Martin reported to the Aurora Police Department along with his mother and step-father. During questioning, Martin stated that he reported to the station because his mother told him that the police were looking for him and she urged him to resolve this situation by turning himself in to tell his story. At the police station, Martin was interrogated by two officers for almost two hours. The entire interrogation was recorded on DVD. We base the following account on our review of that video.

After arriving at the station, Martin was placed in an interrogation room, where he waited for officers to question him. After a few moments of silence, two officers entered the interrogation room. They introduced themselves and asked Martin for basic information, such as his name, address, and phone number. The officers told Martin that they had wanted him to come to the station because his name came up in connection with a shooting that had taken place the previous day in Aurora, Colorado.

The officers then told Martin that he was in custody, and one of the officers read Martin his rights. After each sentence, the officer paused and asked Martin to confirm that he understood, by asking "Do you understand that?" or "Okay?" Each time, Martin confirmed his understanding, either verbally or by nodding his head. Neither officer asked Martin if he wished to waive his rights or if he wanted an attorney during questioning.

After reading Martin his *Miranda* rights, the officers immediately initiated the interview. The officers began with simple questions about Martin's life, asking where he went to high school and with whom he generally spends his time. Martin answered these questions, appearing relaxed and cooperative. After approximately seven minutes of introductory questions, the officers asked Martin to describe the previous day. Although he skipped details, Martin answered these questions without wavering. At several points, he spoke continuously for more than a minute without the officers asking any questions.

Initially, Martin admitted that he heard shots fired, but he maintained that he had nothing to do with the altercation or the shooting. The officers then asked Martin to draw a map of the area where the shooting took place and to describe where he was during the shooting. Martin complied without any hesitation. For more than two minutes, Martin gave an uninterrupted account of where he was immediately before, during, and after the shooting. While Martin spoke, the officers asked no questions.

Eventually, the officers confronted Martin by telling him that at least two witnesses had identified him as being involved in the incident. Martin was initially reluctant to change his story, but he ultimately admitted that he was involved in the altercation that led to the shooting. However, he consistently maintained that he did not pull the trigger.

After approximately one hour of conversation, the officers took a DNA sample from Martin. Then they left Martin alone in the interrogation room while they took the sample to the lab. After ten minutes, they returned and took Martin to the bathroom. Upon his return from the bathroom, Martin was left alone in the interrogation room for another ten minutes. When the officers returned, questioning resumed, and Martin continued to cooperate. He signed the map that he had previously drawn of the crime scene.

Martin's calm demeanor persisted until the officers told him that at least two witnesses had identified him as the shooter. At this point, after having spoken with the officers for an hour and forty-five minutes, Martin became upset and began to cry. The officers continued to ask questions, but Martin continued to state that he had not pulled the trigger. Eventually, Martin refused to answer any more questions. He stated, "I'm not gonna say nothing else, man, until I get a lawyer." The interrogation then ended immediately.

Prior to trial, Martin moved to suppress the statements he made to the officers on the basis that he never waived his *Miranda* rights. The trial court agreed. The trial court noted that Martin never expressly waived his rights and concluded that no waiv-

er could be inferred from his conduct because the officers began questioning Martin immediately after reading him his rights. The court stated that Martin "would have been hard pressed to find the time to fully appreciate the rights he would be giving up or find an opportunity to assert those rights while under the pressures of interrogation." The trial court held that Martin "was not provided the full opportunity to exercise the privilege against self-incrimination," and that his "right against self-incrimination was never knowingly and voluntarily waived." Accordingly, the trial court granted his motion to suppress. This interlocutory appeal followed.

## Analysis

The prosecution argues that Martin's statements should not have been suppressed because his actions implied his intent to waive his Miranda rights. More specifically, they argue that he knowingly, intelligently, and voluntarily relinquished his rights when he chose to answer the officers' questions. Martin counters that the officers never gave him an opportunity to consider his rights and that the attendant facts do not demonstrate that he intended to waive his rights. Ultimately, our analysis leads us to agree with the prosecution.[1]

### Standard of Review

■ In reviewing a suppression order, we are presented with mixed questions of law and fact. *People v. Adkins,* 113 P.3d 788, 790 (Colo.2005). "We defer to the trial court's findings of fact where there exists sufficient evidence in the record to support them." *Id.* at 791. The trial court's conclusions of law, however, are subject to de novo review. *Id.*

■ We review the validity of a *Miranda* waiver under a de novo standard. *People v. Clayton,* 207 P.3d 831, 835 (Colo. 2009) (citing *People v. Matheny,* 46 P.3d 453,

462 (Colo.2002)). Therefore, we conduct an independent review of the interrogation video to determine whether there was a valid Miranda waiver. *See People v. Broder,* No. 09SA228, 222 P.3d 323, 2010 WL 104661, at *1 (Colo. Jan. 11, 2010). To determine whether a suspect has waived his *Miranda* rights, we engage in "a two-step process: first, [we] determine whether the defendant was adequately warned of the privilege against self-incrimination and his right to counsel; and, second, [we] determine whether the defendant knowingly, intelligently, and voluntarily waived these rights." *People v. Chase,* 719 P.2d 718, 720 (Colo.1986).

■ The prosecution bears the burden of proving by a preponderance of the evidence that the suspect was properly advised of his rights and that he waived them knowingly, intelligently, and voluntarily. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *People v. Clayton,* 207 P.3d 831, 835 (Colo.2009) (citing *People v. Mejia–Mendoza,* 965 P.2d 777, 780 (Colo. 1998)).

■ An express written or oral statement of waiver is not always necessary. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). "The question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background experience and conduct of the accused.'" *Id.* at 374, 99 S.Ct. 1755 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Under certain circumstances, "[w]aiver can be clearly inferred from the actions and words of the person interrogated." *Id.* Although "mere silence" is not enough, "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver," may support a conclusion that the defendant waived his rights. *Id.*

---

1. For the purpose of our analysis, we assume without deciding that Martin was in custody while being interrogated. A *Miranda* violation may only be found when the defendant was in custody while being interrogated. Since the trial court suppressed Martin's statements based on a *Miranda* violation, it necessarily concluded that Martin was in custody. The facts strongly support the conclusion that Martin was in custody. There was an arrest warrant for Martin out of Gilpin County; the officers twice told Martin that he was in custody; and Martin was questioned by two officers for almost two hours in a small, windowless room in the police station.

## Martin Was Properly Advised of His Rights

■ The officer who interviewed Martin advised him of his *Miranda* rights by reading from a card. After each sentence the officer paused, asking either "Do you understand that?" or "Okay?" Each time, Martin affirmed, either verbally or by nodding his head, that he understood. As such, we agree with and defer to the trial court's findings that Martin was properly advised of his *Miranda* rights. This finding satisfies the first aspect of our waiver inquiry.

## Martin Waived His Rights Knowingly, Intelligently, and Voluntarily

■ Now we must determine whether Martin actually waived his rights knowingly, intelligently, and voluntarily. *Clayton,* 207 P.3d at 835. Martin concedes that he acknowledged his understanding of his rights and chose to speak with the officers without invoking those rights. Numerous federal and state courts have found implied waiver under similar circumstances. *See, e.g., United States v. Nichols,* 512 F.3d 789, 798 (6th Cir.2008) ("[W]hile it does not require much to invoke the right to silence, it does require something that indicates a desire not to be questioned."); *United States v. Washington,* 462 F.3d 1124, 1134 (9th Cir.2006) ("A person waives the right to remain silent if, after being informed of that right, the person does not invoke that right."); *United States v. Cardwell,* 433 F.3d 378, 389–90 (4th Cir.2005) ("Because [the defendant] had been fully informed and indicated his understanding of his *Miranda* rights, his willingness to answer ... question[s] is as clear an indicia of his implied waiver of his right to remain silent as we can imagine."); *United States v. Velasquez,* 626 F.2d 314, 320 (3d Cir.1980) ("[Defendant's] willingness to answer questions after acknowledging that she understood her *Miranda* rights is sufficient to constitute an implied waiver under *Butler*."); *People v. Cruz,* 44 Cal.4th 636, 80 Cal.Rptr.3d 126, 187 P.3d 970, 995 (2008) ("[W]e find that defendant's responses to [the officer's] inquiries reciting his *Miranda* rights reflect a knowing and intelligent understanding of those rights, and that defendant's willingness to answer

questions after expressly affirming on the record his understanding of each of those rights constituted a valid implied waiver of them.").

Nevertheless, Martin argues that the particular facts and circumstances of his case do not demonstrate implied waiver. More specifically, he argues that, because the officers began asking questions immediately after his advisement, he was not given the full opportunity to consider his rights and did not waive them knowingly. Neither the facts nor the law support this argument.

The circumstances surrounding the interrogation show that Martin's decision to speak to the officers was knowing and voluntary. Martin voluntarily came to the station to speak with police about the shooting. He was cooperative throughout the interview. The officers used no coercive tactics to obtain his waiver. Martin consistently answered questions and drew and signed a diagram of the crime scene.

Regarding Martin's opportunity to consider and exercise his *Miranda* rights, our research reveals no case law suggesting that officers must pause for a specified period of time to allow a suspect to consider his rights before asking questions. Rather, our case law suggests that it is preferable for officers to start questioning soon after giving a *Miranda* advisement. *See Billings v. People,* 171 Colo. 236, 241, 466 P.2d 474, 476 (Colo. 1970) ("Had the confession of the defendant immediately followed the giving of the *Miranda* warnings, we might reach a conclusion that the defendant's statement, 'I understand,' constituted sufficient evidence to support a finding that the defendant had waived his rights against self-incrimination ...."); *see also* 2 Wayne R. LaFave, et al., *Criminal Procedure* § 6.9(d) (3d Ed.2007) at 832 ("[W]hile an acknowledgment of understanding should not inevitably carry the day, it is especially significant when defendant's incriminating statement ·follows immediately thereafter.").

Initially, the officers did not ask questions likely to elicit incriminating statements. *See People v. Madrid,* 179 P.3d 1010, 1014 (Colo. 2008) (explaining that, for *Miranda* purposes, custodial interrogation means " 'any

words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect'" (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)) ). For the first few minutes of the interview, the officers asked basic questions like "How long have you been staying on Ash [Street]?"; "Where did you go to high school?"; and "Which [high] school did you like the best?" Several minutes passed before the officers asked about the previous day's events and the interrogation began in earnest. Prior to this time, Martin could have considered his rights and invoked them before revealing any incriminating information.

Martin was left alone for twenty minutes during the interrogation but did not exhibit any increased reluctance to speak with the officers after these two breaks. The first thing he did after the second break was sign the map of the crime scene that he previously drew. If Martin used this time to consider his rights, then he did not choose to exercise them until later in the interrogation.

When Martin finally did invoke his rights, he told the officers, "I'm not gonna say nothing else, man, until I get a lawyer." Martin invoked his rights clearly and definitively at this point. Absent a second advisement, Martin's invocation of his rights at this point in the interview supports our conclusion that he understood and was aware of his *Miranda* rights. By responding cooperatively to police questioning about the shooting for close to two hours after being adequately advised of his rights, Martin's course of conduct exhibits a clear intent to waive his *Miranda* rights.

In light of the circumstances discussed above, we conclude that Martin validly waived his *Miranda* rights. Martin came to the station voluntarily and told the police that he wanted to tell his story. He was properly advised of his rights before being questioned. He acknowledged that he understood these rights. He then answered the officers' questions without hesitation for an hour and forty-five minutes. During this time, Martin had several opportunities to pause and consider his rights, but he did not choose to invoke his rights until the officers confronted him with the fact that witnesses had identified him as the shooter. Hence, we hold that, under these particular facts and circumstances, Martin waived his *Miranda* rights knowingly, intelligently, and voluntarily.

### Conclusion

For the reasons stated above, we reverse the trial court's suppression order and remand this case to that court for proceedings consistent with this opinion.