23CA0305 Peo v Brown 01-08-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0305
Arapahoe County District Court No. 20CR2211
Honorable Elizabeth Weishaupl, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kyree Anthony Brown,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE SCHOCK
Harris and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 8, 2026

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver,
Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica A. Pitts, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, Kyree Anthony Brown, appeals his convictions and sentences on two counts of felony murder and other offenses. He argues that the district court erred by denying his motion to suppress statements he made during a police interrogation and by excluding testimony from a defense expert concerning the brain development of young adults. He also contends that his sentences of life imprisonment without the possibility of parole (LWOP) for felony murder are unconstitutional and that the district court improperly imposed aggravated-range sentences for arson, motor vehicle theft, and theft based on a fact not found by the jury.

¶ 2    We agree with Brown's final argument, reverse the sentences on the lesser offenses, and remand for resentencing on those counts within the presumptive range. We otherwise affirm the judgment.

## I.    Background

¶ 3    In August 2020, when Brown was eighteen years old, he stole a car and posted it for sale online. The victims, a husband and wife, agreed to buy the car, not knowing it was stolen. But Brown did not plan to sell the victims a car. He planned to rob them.

¶ 4    The victims met Brown as agreed in the well-lit parking lot of a shopping center. Brown then told them to follow him to a different

1

location so he could get the title for the car. That second location turned out to be the dark parking lot of an apartment complex.

¶ 5 According to Brown's later account, when they arrived, Brown pulled out a gun and demanded the money. Brown claimed that the husband grabbed Brown's arm, and Brown started shooting, killing both victims. He then took most of the money and fled in the stolen car, later setting it on fire and abandoning it. Police found $1,300 in the victims' car in an envelope marked "5K."

¶ 6 The investigation of the shooting eventually led to Brown, and he was arrested after a high-speed car chase in which he was a passenger. The chase ended when police intentionally crashed into Brown's vehicle. During the interrogation that followed, Brown eventually confessed to robbing and killing the victims.

¶ 7 Brown was charged with two counts of first degree murder after deliberation, two counts of felony murder, two counts of aggravated robbery, and several other counts. A jury found him guilty of the lesser included offenses of second degree murder (but not first degree murder after deliberation), both counts of felony murder, and all remaining counts. The district court merged some counts and vacated the second degree murder convictions on the

ground that only one murder conviction was permitted per victim. It sentenced Brown to consecutive LWOP prison terms for the felony murders and an additional twelve years for the other offenses.

## II.     Motion to Suppress Statements

¶ 8      Brown first contends that his statements during the police interrogation should have been suppressed because both his waiver of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), and his ensuing statements were involuntary.  We disagree.

## A.     Additional Background

¶ 9      On the day of Brown's arrest, police officers saw him getting into the passenger seat of a vehicle.  When they attempted to stop the vehicle, the driver fled, leading officers on a twenty-minute high-speed chase that ended with officers crashing into the vehicle.  The officers approached the vehicle with guns drawn, broke the window, and removed Brown from the vehicle through the broken window.

¶ 10      Brown generally complied with the officers' commands and did not appear agitated or upset.  He had a small cut on his arm but was otherwise uninjured and declined any medical assistance.

¶ 11      Brown was arrested and taken to the police station, where he was placed in an interview room.  Approximately three hours after

Brown's arrest and one hour after he had been placed in the room, two detectives arrived to speak with him. After confirming that Brown's arm was okay, one of the detectives explained:

> I would like to talk with you . . . about a crime that happened in Aurora but you're in custody right now. And I can't talk with you unless a few things happen. Number one you have to be willing to talk to me. Number two before we talk, I would have to make sure you understand your rights . . . your *Miranda* rights. Do you know what I'm talking about? [Brown nodded his head.] You have the right to remain silent. All that stuff . . . . [I]f you want I can read you your rights, you don't have to talk with us but we'd like to talk with you . . . or you can decide to not talk with us at any time. But before I can talk with you about anything, I would have to read you your rights.

¶ 12 The detective then asked Brown if he would be willing to speak with them. Brown responded, "I don't know, I'm just like confused . . . like what is . . . you can't tell me either huh?" The detective said, "Not if I don't read you your rights." Brown agreed that the detective could read them, and the detective continued:

> Okay, like I said it's up to you, I'm not trying to be sneaky. . . . I just want to make sure that you understand everything and then also want to make sure that we do everything legal of course. All right. So you have probably heard

these before on tv and stuff. I'm just going to read them to you straight off the card.

¶ 13    The detective then advised Brown of his *Miranda* rights, concluding with, "So basically, you don't have to talk to us if you don't want to." Brown confirmed that he understood his rights and agreed to answer questions. The detectives took Brown's handcuffs off and spoke with him for approximately two hours, during which Brown effectively confessed to robbing and killing the victims.

¶ 14    Brown moved to suppress his statements. He argued that his waiver of his *Miranda* rights was involuntary because he was "still under the stress of the life-threatening car chase and crash."

¶ 15    The district court denied the motion after an evidentiary hearing. The court first concluded that Brown's *Miranda* waiver was valid, finding that (1) nothing in Brown's demeanor at the time of his arrest, transport, or interview raised any concerns as to his medical well-being or state of mind; (2) although Brown had a small cut on his arm, he did not appear to be in pain; (3) Brown was paying attention when the *Miranda* warnings were read and seemed to understand them; and (4) Brown was calm and did not appear to be "afraid" or "dazed." The court then concluded that Brown's

statements were voluntary under the totality of the circumstances, highlighting, among other things, the conversational tone of the interview and the absence of any threats or coercive behavior.

## B.     Standard of Review and Applicable Law

¶ 16     A ruling on a motion to suppress is a mixed question of fact and law. *People v. Ashford*, 2020 CO 16, ¶ 9. In reviewing such a ruling, we generally defer to the district court's factual findings if they are supported by the record and review the legal effect of those facts de novo. *People v. Taylor*, 2018 CO 35, ¶ 7. But when, as here, the interrogation is recorded and there are no pertinent disputed facts outside of the recording, "we are in essentially the same position as the [district] court" and may independently review the recording to determine whether the evidence should have been suppressed in light of controlling law. *Id.* Both the voluntariness of a *Miranda* waiver and the voluntariness of a defendant's statements are legal questions that we review de novo. *People v. Smiley*, 2023 CO 36, ¶ 12; *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010).

¶ 17     A *Miranda* waiver is valid only if it is voluntary, knowing, and intelligent. *Smiley*, ¶ 15. A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or

deception." *Id.* at ¶ 16 (citation omitted). A waiver is involuntary only if "'coercive police activity' . . . 'played a significant role in inducing'" the waiver. *Id.* at ¶¶ 20-21 (citations omitted). This inquiry turns on the totality of the circumstances, including but not limited to the defendant's "age, education, background, and intelligence; his experience with the criminal justice system; how his *Miranda* rights were explained and when they were given; whether the detectives engaged in any potentially coercive conduct; and the timing of the alleged misconduct." *Id.* at ¶ 34; *see also People v. Thames*, 2015 CO 18, ¶ 14 (listing additional relevant considerations). If a *Miranda* waiver is not voluntary, the defendant's statements must be suppressed. *Smiley*, ¶¶ 44-45.

¶ 18    Moreover, even if a *Miranda* waiver is valid, the defendant's statements must be suppressed if those *statements* are involuntary. *People v. Zadran*, 2013 CO 69M, ¶ 9; *see also Smiley*, ¶ 18 (noting that voluntariness of statements and voluntariness of waiver are "analytically distinct" (citation omitted)). A statement is involuntary if the police conduct overbore the defendant's will and elicited a statement that was "not freely self-determined." *People v. Ramadon*, 2013 CO 68, ¶ 20. Like an involuntary waiver, that determination

7

requires two findings: (1) "the police conduct must have been coercive," and (2) "the coercive police conduct must have played a significant role in inducing the statements." *Id.* In conducting this inquiry, we consider the totality of the circumstances, including

(1)  whether the defendant was in custody;

(2)  whether the defendant was free to leave;

(3)  whether the defendant was aware of the situation;

(4)  whether the police read *Miranda* rights to the defendant;

(5)  whether the defendant understood and waived *Miranda* rights;

(6)  whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

(7)  whether the statement was made during the interrogation or volunteered later;

(8)  whether the police threatened the defendant or promised anything directly or impliedly;

(9)  the method or style of the interrogation;

(10) the defendant's mental and physical condition just prior to the interrogation;

(11)  the length of the interrogation;

(12)  the location of the interrogation; and

(13)  the physical conditions of the location where the interrogation occurred.

*Cardman v. People*, 2019 CO 73, ¶ 23.

### C.  Voluntariness of *Miranda* Waiver

¶ 19    Brown contends that his *Miranda* waiver was involuntary because (1) the show of force by police during his arrest created a coercive atmosphere; (2) the detective asked Brown if he would talk before advising him of his rights; and (3) the detective trivialized his *Miranda* rights by treating them as a formality.  Brown argues that these factors, combined with others, made his waiver involuntary under the totality of the circumstances.  We are not persuaded.

¶ 20    As to the circumstances of Brown's arrest, we agree that a violent arrest *could* affect the voluntariness of a waiver made in the wake of that arrest.  But the video and record belie such a conclusion in this case.  Although the high-speed chase and arrest at gunpoint were undoubtedly stressful events, Brown's *Miranda* waiver came almost three hours later.  By that time, Brown was calm and did not show any signs of distress.  Indeed, the arresting

officer testified that, even at the time of Brown's arrest, his demeanor "seemed all right," and he did not appear angry or upset.

¶ 21 Brown asserts that the three hours between his arrest and his interrogation served to magnify the coercive effect of his arrest by increasing his anxiety. But again, the record does not reflect that, suggesting instead that the intensity of the earlier events had dissipated. The conversation preceding the waiver was calm and conversational, beginning with Brown's remark that he was doing "pretty good," and the detective did nothing to exacerbate Brown's anxiety. Even if Brown felt some discomfort as a result of being placed in an interrogation room, the record provides no basis to conclude that he could not freely waive his rights. *See People v. Clayton*, 207 P.3d 831, 837-38 (Colo. 2009) (holding that "typical discomfort" associated with police interview did not make waiver invalid where it was not "caused by government misconduct").

¶ 22 For Brown's next two points, he relies on *Smiley*. In *Smiley*, the supreme court held that the defendant's *Miranda* waiver was invalid where detectives had made "affirmative misrepresentations apparently employed to trick [the defendant] into waiving his rights." *Smiley*, ¶¶ 38, 44. Among other things, the detectives in

*Smiley* falsely told the defendant he was not in trouble, falsely told the defendant they had to advise him of his rights only because they were from out of state, and elicited incriminating statements from the defendant before advising him. *Id.* at ¶¶ 37-44.

¶ 23   This case is not like *Smiley*. Most importantly, the detectives here did not make any affirmative misrepresentations to Brown to induce his waiver. *See id.* at ¶¶ 24-25 (distinguishing between the withholding of information and affirmative misrepresentations). Nor did they elicit incriminating statements from Brown before the waiver. *See id.* at ¶¶ 36, 43. To the contrary, the detective told Brown at the outset that he was in custody and that he would not talk to him at all until he made sure Brown understood his rights.

¶ 24   Although the detective asked Brown pre-waiver if he would be willing to speak to him, he did not "exact [Brown's] decision to waive" before advising him of his rights and then "offer [him] an opportunity to rescind that decision." *People v. Honeycutt*, 570 P.2d 1050, 1055 (Cal. 1977). Instead, the detective repeatedly explained that Brown did not need to talk and secured his agreement to do so only *after* advising him of his rights. *See People v. Sellers*, 2022 COA 102, ¶ 12 (*Sellers I*) (rejecting argument that waiver was invalid

11

because the defendant was "encouraged to speak before being read his *Miranda* rights"), *aff'd on other grounds*, 2024 CO 64 (*Sellers II*). The only thing Brown agreed to before his waiver was that the detective could advise him of his rights — which the detective correctly told Brown was a precursor to any further conversation.

¶ 25    We also do not take the detective's comments as improperly trivializing the rights.  Unlike in *Smiley*, where the detectives falsely represented the nature of the rights, the detective in this case correctly explained — albeit colloquially — that the advisement was necessary to ensure the conversation was legal.  In doing so, he did not make any promises or assurances that were inconsistent with the rights.  *See Smiley*, ¶ 42 (collecting cases in which officers implied that the defendants' statements would not hurt them).  And the detective's reference to Brown likely having "heard [the warnings] before on tv" seemed more geared toward orienting Brown to the rights he was about to hear than "downplay[ing] [their] importance."  *Id.*; *see also United States v. Price*, 980 F.3d 1211, 1226 (9th Cir. 2019) (holding waiver was valid where agent described *Miranda* warnings as "just like you see on T.V.").  Even if this statement could have given the impression that the advisement

12

was a "mere formality," *Smiley*, ¶ 42, it would not, without more, make Brown's waiver involuntary, *see id.* at ¶ 34 (noting that "the use of a single coercive tactic may not render a waiver invalid").

¶ 26    Brown highlights several other similarities to *Smiley* — including that he was eighteen years old, was experiencing homelessness, and had no previous contact with law enforcement as an adult or for serious offenses. We agree that these factors all form part of the totality of the circumstances. *See id.* at ¶¶ 34-35, 44. But the totality of the circumstances also includes Brown's calm and alert demeanor, the detective's conversational tone, the absence of any threats or promises, the lack of any indication that Brown did not understand his rights, and his acknowledgment that he did. *See Thames*, ¶ 21 ("[A] defendant's response that he understands his rights is an important factor in the totality of the circumstances analysis."); *Clayton*, 207 P.3d at 838 (concluding that waiver was voluntary where detective "maintained a conversational tone and did not engage in threats or trickery").

¶ 27    Viewing these circumstances as a whole, we see no coercive police activity, much less any such conduct that played a

significant role in inducing Brown to waive his rights. *See Smiley*, ¶¶ 20-21. We thus conclude that Brown's waiver was voluntary.

### D. Voluntariness of Statements

¶ 28 For similar reasons, we conclude that Brown's statements, made after his *Miranda* waiver, were voluntary.

¶ 29 Of the thirteen nonexhaustive factors that we consider, several support a conclusion of voluntariness. *See Cardman*, ¶ 23 (listing factors). The detectives advised Brown of his *Miranda* rights (factor four), and Brown understood and waived those rights (factor five). The detectives made clear that Brown was under arrest, even if they did not at first specify the crime they were investigating (factor three). Most significantly, Brown was calm, alert, and uninjured (factor ten); the interrogation was conversational (factor nine); and the detectives did not make any overt or implied threats or promises (factor eight). The two-hour duration of the interview (factor eleven) and the physical condition of the interrogation room — a fairly typical small windowless room with a table and chairs (factor thirteen) — do not weigh heavily in either direction, but we agree with the district court that neither is indicative of coercion.

¶ 30    Brown points out that a few of the factors weigh against voluntariness. In particular, he was in custody (factor one), not free to leave (factor two), and in an interrogation room at the police station (factor eleven). Although he was advised of his right to counsel, he did not invoke that right and did not speak with counsel or anyone else before the interrogation (factor six). And he made the statements in response to the interrogation (factor seven). But these are the circumstances of any custodial interrogation in which a defendant waives *Miranda* rights. They do not, without more, make the ensuing statements involuntary. *See Cardman*, ¶ 27 ("We do not accord the same weight to each of the thirteen factors, and how much weight we accord each factor in a particular case depends on the circumstances involved.").

¶ 31    Considering the totality of the circumstances, the detectives' conduct was not coercive, and there was no indication that Brown's will was overborne. *See Ramadon*, ¶ 20. To the contrary, notwithstanding that Brown was in custody, the video of the interrogation supports the conclusion that his statements were "the product of [his] essentially free and unconstrained choice." *Id.* at ¶ 19; *see also Zadran*, ¶ 19 (holding that the defendant's statements

15

made while in custody and after a *Miranda* waiver were voluntary where the defendant "seemed calm and composed, and the style of the interrogation was conversational"). We therefore conclude that the district court correctly denied the motion to suppress.

### III. Exclusion of Expert Testimony on Brain Development

¶ 32 Brown next argues that the district court reversibly erred by excluding generalized expert testimony about the brain development of teenagers. Because the proffered testimony was immaterial to the offenses for which Brown was convicted, we disagree.

#### A. Additional Background

¶ 33 Before trial, defense counsel endorsed a psychologist to testify as an expert about "impulsivity and decision-making by juveniles and adults with developing brains." Defense counsel explained that the expert would not offer any opinion about Brown's "capability to form the requisite mens rea, nor any other case-specific opinion," but would instead offer generalized testimony concerning the "natural and normal progressions of brain development." He asserted that such testimony was relevant to Brown's mens rea because it could contextualize "certain behaviors by [Brown] [that]

16

may be in conflict with what an ordinary jury might intuitively expect if he were not acting with the premeditated intent to kill."

¶ 34 The prosecution objected to such testimony on the ground that it would constitute "mental condition" evidence under section 16-8-107(3)(b), C.R.S. 2025, and Brown had not complied with the procedures in that statute, including notice and completion of a court-ordered examination. The prosecution argued that the only potential relevance of such testimony would be to suggest that Brown's "impaired mental condition" as a young adult prevented him from forming the mens rea of "after deliberation and intent."

¶ 35 At a hearing on the issue, defense counsel explained that the purpose of the expert testimony was to rebut the prosecution's argument that, by directing the victims from one location to another, Brown "had a plan . . . to commit these murders at a second location." Likening the testimony to generalized expert testimony about the cycle of violence in a domestic violence case, defense counsel asserted that the testimony would help to show that "a person Mr. Brown's age, in the totally normal development of the human decision-making process, may not have . . . made the deliberation and formed the mens rea to commit first degree after

17

deliberation murder." When the court asked what fact the proposed evidence made more or less probable, defense counsel responded that the proffered evidence made it less likely that Brown had "form[ed] a plan to murder the victims" and, thus, had "the requisite mental intent for the top charges of first degree murder."

¶ 36    The district court barred the testimony. It concluded that (1) to the extent the expert testimony concerned whether Brown had formed the requisite mental state, it was "mental condition" evidence subject to section 16-8-107(3)(b); and (2) to the extent the testimony did not concern Brown's mental state, it was irrelevant.

B.    Applicable Law and Standard of Review

¶ 37    Under section 16-8-107(3)(b), a defendant may not introduce "evidence in the nature of expert opinion concerning the defendant's mental condition" without notice and a court-ordered examination. The statute does not define "mental condition," but the provision is "broad" and may include conditions that do not necessarily qualify as "mental disorder[s]" under psychiatric standards. *People v. Wilburn*, 2012 CO 21, ¶ 28 (learning disorder); *see also People v. Flippo*, 159 P.3d 100, 102 (Colo. 2007) (intellectual disability); *People v. Herdman*, 2012 COA 89, ¶ 26 ("drug-induced toxicity").

18

¶ 38    We review the district court's exclusion of evidence under section 16-8-107(3)(b) for an abuse of discretion, which occurs when the decision is "manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding of the law." *People v. Day*, 2023 COA 115, ¶ 14 (*cert. granted in part* Dec. 23, 2024). But we review the interpretation of the statute de novo. *Wilburn*, ¶ 19. When the district court erroneously applies this statute to preclude evidence relevant to the defendant's culpable mental state, we will reverse unless the error was harmless beyond a reasonable doubt. *Day*, ¶ 14; *see also People v. Vanrees*, 125 P.3d 403, 409 (Colo. 2005) (holding that a defendant has a "constitutional right" to present evidence relevant to "whether he factually formed the culpable mental state of the crime charged").[1]

---

[1] The parties dispute whether the constitutional or nonconstitutional harmless error standard should apply. *Compare People v. Day*, 2023 COA 115, ¶ 14 (applying constitutional standard) (*cert. granted in part* Dec. 23, 2024), *with People v. Flippo*, 159 P.3d 100, 106 (Colo. 2007) (noting that the statute controls only "the manner in which the evidence is presented"). Because we conclude that the exclusion of the evidence was harmless even under the more stringent constitutional standard, we will assume that standard applies.

## C. Analysis

¶ 39    Brown contends that the district court erred by treating his proffered expert testimony about the brain development of young adults as "mental condition" evidence under section 16-8-107(3)(b).

¶ 40    That is a novel question, and a difficult one. On one hand, as offered to suggest that Brown's developing brain explained why he might have lacked the requisite mens rea, it resembles other types of "mental condition" evidence to which the statute applies. *See People v. Lane*, 2014 COA 48, ¶ 27 (holding that generalized testimony about post-traumatic stress disorder was subject to statute, even though the expert did not intend to testify that the defendant suffered from the condition); *Wilburn*, ¶ 25 (applying statute to evidence that the defendant's dyslexia negated his mens rea). On the other hand, a trait that is part of the "natural and normal progressions of brain development" does not fit neatly into a box that is ordinarily reserved for mental disorders and illnesses. *See People v. Moore*, 2021 CO 26, ¶ 5 (holding that statute applies to "less-severe mental illness" that is not indicative of insanity).

¶ 41    We need not resolve that difficult question in this case, however, because even if the district court erred by excluding the

evidence, any error would be harmless beyond a reasonable doubt. Defense counsel explained that the purpose of the expert testimony was to negate the mens rea for first degree murder after deliberation. In particular, the evidence was offered to rebut the "specific argument" that, in directing the victims to multiple locations, Brown had a plan to kill them and thus acted with "the deliberation . . . to commit first degree after deliberation murder."

¶ 42    But Brown was not convicted of after-deliberation murder. He was convicted of *felony* murder.[2] Felony murder does not require an intent to kill the victim, much less a plan to do so. *See People v. Gallegos*, 2025 CO 41M, ¶ 16. Instead, the only mens rea required for felony murder is that of the underlying felony — here, robbery. *See People v. Jones*, 990 P.2d 1098, 1103 (Colo. App. 1999). Evidence that teenagers act impulsively has no bearing on whether

---

[2] The jury also found Brown guilty of second degree murder, but those convictions were vacated. *See People v. Hickman*, 684 P.2d 228, 231 (Colo. 1984) (holding that second degree murder conviction must be vacated when the defendant is convicted of felony murder for the same homicide), *abrogated on other grounds by, Rojas v. People*, 2022 CO 8. Regardless, second degree murder does not require a plan either, and Brown's impulsivity has no bearing on whether he knowingly killed the victims — i.e., whether he was aware that by shooting them, he was practically certain to kill them. *See* §§ 18-3-103(1)(a), 18-1-501(6), C.R.S. 2025.

Brown *knowingly* took something of value from the person or presence of the victims by force, threats, or intimidation. *See* § 18-4-301(1), C.R.S. 2025. And with one exception, none of the other offenses for which Brown was convicted required a plan either.

¶ 43    The only one of Brown's convictions that required a plan, or intent, was his misdemeanor conviction for bait advertising. *See* § 18-5-303(1), C.R.S. 2025. Brown does not argue that the proposed testimony was material to this charge, nor did he make that argument in the district court. In any event, the evidence overwhelmingly established that, regardless of whether Brown had a plan to kill the victims, he offered the car for sale with the intent or plan not to sell it. *See id.* Not only did the evidence establish that Brown did not intend to sell the car to the victims, but after burning and abandoning the car, Brown continued to list it for sale and messaged an apparent prospective buyer about selling it.

¶ 44    Thus, proper or not, there is no reasonable probability that the exclusion of the expert testimony about teenagers' brain development contributed to Brown's convictions *See Day*, ¶ 37. Any error was therefore harmless beyond a reasonable doubt.

## IV. Constitutionality of LWOP Sentences

¶ 45    Brown contends that his LWOP sentences — which were mandated by statute — are unconstitutional for two reasons.  First, he asserts that an LWOP sentence is categorically disproportionate to the crime of felony murder, particularly in light of recent legislation reducing felony murder to a class 2 felony punishable by a maximum of forty-eight years in prison.  *See* § 18-3-103(1)(b), C.R.S. 2025.  Second, he argues that a mandatory LWOP sentence for a teenager is cruel and unusual punishment.  We review the constitutionality of Brown's sentence de novo.  *See Sellers II*, ¶ 16.

¶ 46    As Brown acknowledges, his first argument is foreclosed by *Sellers II*.  In *Sellers II*, the supreme court considered and rejected that argument, concluding that an LWOP sentence for felony murder is not categorically unconstitutional under either the Eighth Amendment or the Colorado Constitution.  *Sellers II*, ¶ 37.  Although Brown contends that *Sellers II* was wrongly decided, we are bound by it.  *See People v. Melendez*, 2024 COA 21M, ¶ 19.

¶ 47    Brown's second argument is foreclosed as well.  As a general rule, "an LWOP sentence imposed upon a class-1-felony conviction is facially constitutional."  *People v. Ray*, 2025 CO 42M, ¶ 175.  As

Brown points out, the United States Supreme Court has carved out an exception for mandatory LWOP sentences for *juveniles*, holding that such sentences are categorically unconstitutional. *See Miller v. Alabama*, 567 U.S. 460, 479 (2012). But Brown was not a juvenile at the time of his offense — he was eighteen years old. *See Roper v. Simmons*, 543 U.S. 551, 574 (2005) (drawing the line between childhood and adulthood for purposes of the Eighth Amendment at the age of eighteen — "where society draws the line for many purposes"). And in banning mandatory LWOP sentences for juveniles, *Miller* drew the line between children and adults — not between categories of adults or between those adults whose brains are fully developed and those whose are not. 567 U.S. at 471.

¶ 48    In *Ray*, the supreme court considered an argument to extend *Miller*'s ban on mandatory LWOP sentences to "emerging adults," or those between eighteen and twenty at the time of their offenses. *Ray*, ¶ 174. Although the court did not definitively decide the issue because the defendant had received "individualized consideration," it explained that both the Colorado legislature and the United States Supreme Court recognize eighteen as the age that divides juveniles — who cannot be sentenced to mandatory LWOP — from

adults — who can. *Id.* at ¶¶ 176, 182. And it noted that "Colorado has not yet followed suit" of other states that have expanded this prohibition to include defendants eighteen and older. *Id.* at ¶ 177.[3]

¶ 49      Brown nevertheless asks us to do what *Ray* did not and expand *Miller*'s ban to adult teenagers. For purposes of the Eighth Amendment, we may not do so. The Supreme Court has drawn the line at the age of eighteen, and we are bound by that line. *See Ray*, ¶ 171 (recognizing that, subject to the Eighth Amendment, "it is the legislature's prerogative to define crimes and punishments").

¶ 50      Moreover, while *Miller* does not bind us with respect to the Colorado Constitution, Colorado courts have not interpreted the state constitution to provide greater protection than the Eighth

---

[3] Brown notes that the Colorado legislature has extended eligibility for certain programs, including placement in the youthful offender system and other specialized sentencing programs, to young adults between the ages of eighteen and twenty. *See* §§ 18-1.3-407.5(3), 18-1.3-407(1)(c)(II), 17-34-102(1), C.R.S. 2025. But it expressly excluded young adults convicted of class 1 felonies or sentenced to LWOP from these programs. *See* § 18-1.3-407.5(2)(a)(I), § 17-34-101(1)(a), C.R.S. 2025; *People v. Ray*, 2025 CO 42M, ¶ 177.

Amendment. *See Sellers II*, ¶ 36.[4]  Thus, while we acknowledge that some states have expanded *Miller*'s protections to young adults eighteen or older based on their *state* constitutions, we see no basis under our state constitution to do so.  *See Commonwealth v. Mattis*, 224 N.E.3d 410, 428 (Mass. 2024) (holding that LWOP sentence for "emerging adult offenders" under the age of twenty-one violates state constitution); *In re Monschke*, 482 P.3d 276, 279-81, 280 n.6 (Wash. 2021) (noting that state constitution provides greater protection than Eighth Amendment in juvenile sentencing context); *People v. Parks*, 987 N.W.2d 161, 172 (Mich. 2022) (rejecting argument to extend *Miller* under Eighth Amendment but concluding that state constitution provides "broader protections").

¶ 51     We therefore hold that Brown's LWOP sentence is constitutional.  In doing so, we recognize that a bright line — at the

---

[4] Brown points out that the plurality opinion in *People v. Young*, 814 P.2d 834, 846 (Colo. 1991), *superseded by statute on other grounds*, Ch. 292, sec. 8, § 16-12-102(1), 1993 Colo. Sess. Laws 1728-29, concluded that the Colorado Constitution would invalidate the death penalty statute in that case even if the Eighth Amendment did not.  That opinion was not a majority opinion and does not undermine the supreme court's more recent pronouncement in *Sellers v. People*, 2024 CO 64, ¶ 36 (*Sellers II*), *aff'g on other grounds*, *People v. Sellers*, 2022 COA 102 (*Sellers I*).

26

age of eighteen or any other — may in some sense be artificial.  *See Roper*, 543 U.S. at 574.  But as long as mandatory LWOP sentences are otherwise constitutional, the line must be drawn somewhere.  *Id.*  And when both the Supreme Court and the Colorado legislature have drawn the same line, we see no basis to move it.

## V.    Aggravated Range Sentences

¶ 52    Finally, Brown argues that the district court erred by imposing aggravated-range sentences on his convictions for second degree arson, aggravated motor vehicle theft, and theft based on a fact not found by the jury — namely, that Brown was on probation at the time of the offenses.  The People concede this error, and we agree.

¶ 53    Other than the fact of a prior conviction, any fact that increases the maximum sentence for a crime must be found by a jury beyond a reasonable doubt or admitted by the defendant.  *Erlinger v. United States*, 602 U.S. 821, 834, 838 (2024).

¶ 54    Here, the district court sentenced Brown to the top of the aggravated range — twice the maximum sentence that would otherwise apply — on each of the lesser offenses because Brown was on probation for a juvenile felony offense at the time.  *See* § 18-1.3-401(8)(a)(VI), C.R.S. 2025.  Because that fact was not admitted

by Brown or found by a jury beyond a reasonable doubt, the district court erred. *See id.*; *Mountjoy v. People*, 2018 CO 92M, ¶ 16.

¶ 55 We therefore reverse those sentences and remand for the district court to resentence Brown within the presumptive range.

## VI. Disposition

¶ 56 Brown's sentences for second degree arson, aggravated motor vehicle theft, and theft are reversed, and the case is remanded for resentencing on those offenses within the presumptive sentencing range. The judgment is otherwise affirmed.

JUDGE HARRIS and JUDGE TAUBMAN concur.