2012 COA 89

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Robert HERDMAN, Defendant–Appellant.**

### No. 08CA1374.

Colorado Court of Appeals, Div. VI.

June 7, 2012.

John W. Suthers, Attorney General, John D. Seidel, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Elizabeth Griffin, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge GABRIEL.

¶ 1 Defendant, Robert Herdman, appeals his judgment of conviction for sexual assault, second degree kidnapping, and a crime of violence sentence enhancer. We conclude that (1) the trial court did not reversibly err in admitting the evidence obtained from Herdman's court-ordered mental health examinations, nor did the admission of such evidence violate Herdman's privilege against self-incrimination; (2) an Army sergeant's testimony did not prejudicially violate evidentiary and discovery rules so as to warrant reversal of Herdman's convictions; (3) there was no cumulative error; (4) there was sufficient evidence to support Herdman's sex assault and crime of violence convictions; and (5) Herdman's convictions for sex assault and kidnapping did not violate double jeopardy. We further conclude, however, that a remand is necessary (1) to correct the mittimus to reflect the actual sentence on Herdman's kidnapping conviction and to clarify the manner in which parole is to be determined, and (2) to allow the trial court the opportunity to determine the amount of presentence confinement credit to which Herdman is entitled.

## I. Background

¶ 2 In January 2003, Herdman, a private in the United States Army stationed at Fort Carson, began taking an anti-malarial drug called Lariam, in preparation for his deployment to Iraq. At the time, the Army was

unaware that Lariam could cause psychological side effects.

¶ 3 In April 2003, Herdman was deployed to the Middle East. Shortly thereafter, however, he developed appendicitis, and, after undergoing an emergency appendectomy, he was sent back to Fort Carson on medical leave.

¶ 4 Subsequently, Herdman missed physical training and work details. He also used crack cocaine. A military psychologist diagnosed him with post-traumatic stress disorder (PTSD) from his service in Iraq and recommended that his duties be changed and that he be placed on a medical hold. His superiors refused, however, believing that he was malingering.

¶ 5 On July 31, 2003, the victim was driving to the gym from her apartment when Herdman waved her down. She stopped and let him into the car after he claimed that he needed a ride to get to his girlfriend, who was in trouble. He then pulled out a knife and said, "Do what I want or I'm going to cut you." The victim looked over and saw the knife in Herdman's lap. He then directed the victim to drive back to the apartment complex. When they arrived, he pulled her out of the car and into an apartment. Once they were in the apartment, he smoked or snorted some white powder, ordered the victim into the bedroom, and then sexually assaulted her. During the assault, the knife was on the bed stand, where the victim could see it.

¶ 6 Herdman was subsequently charged with sexual assault, second degree kidnapping, and a crime of violence sentence enhancer. As pertinent here, he ultimately underwent the following court-ordered mental health examinations:

- After Herdman filed a notice, pursuant to section 16–8–107(3)(b), C.R.S.2011, of his intent to introduce evidence concerning his mental condition, he was examined by the first doctor. This doctor did not ultimately testify at trial. Herdman was found incompetent to stand trial and was institutionalized.

- Thereafter, Herdman sought to be released on bond and was evaluated by a second doctor (the bond examiner), who was appointed by the court to assess Herdman's risk to society and flight risk if he were released on bond. This examiner concluded that Herdman's restoration to competency would be more safely and effectively done as an inpatient in an institution, and the court entered an order committing Herdman accordingly.

- While institutionalized, Herdman continued undergoing treatment, during which a third doctor (the competency examiner) performed ongoing competency evaluations. Herdman was ultimately restored to competency.

- Thereafter, Herdman changed his plea to not guilty by reason of insanity, which resulted in his being examined by a fourth doctor (the sanity examiner), pursuant to section 16–8–103.7(2), C.R.S. 2011. This examiner concluded that Herdman was not legally insane at the time of the offense.

¶ 7 Subsequently, Herdman withdrew his insanity plea, entered a not guilty plea, and provided notice of his intent to raise the affirmative defense of involuntary intoxication, based on the psychological effects of Lariam. He then designated experts to opine, among other things, that Lariam had caused him to become psychotic and that he had committed the assault while he was unable to conform his conduct to the requirements of the law.

¶ 8 Thereafter, the court conducted a hearing at which Herdman expressed concern that the prosecution had not identified the experts whom it intended to call to rebut the opinions of his designated experts. The prosecution responded that, at trial, it intended to rebut Herdman's defense of involuntary intoxication with the previously provided opinions of, among others, the bond examiner, the competency examiner, and the sanity examiner, all of whom the prosecutor identified by name. Herdman moved to suppress these experts' opinions, arguing that the admission of this evidence would violate section 16–8–107, C.R.S.2011, but the trial court denied the motion.

¶ 9 The case proceeded to trial, and, as pertinent here, the bond examiner, the com-

petency examiner, and the sanity examiner collectively testified, in substance, that Herdman's psychological problems were not caused by PTSD or Lariam use, but rather resulted from his cocaine use, psychopathy, narcissism, and malingering, among other things. The experts further testified that Herdman showed no empathy or remorse for the victim. Herdman objected to some, but not all, of this testimony.

¶ 10 In addition, one of Herdman's superiors, Sergeant Gallegos, testified, among other things, that Herdman never served in Iraq, did not have PTSD but rather was trying to "play the system" to avoid going back to Iraq, and was "going through a trend of being rebellious." Again, Herdman objected to some, but not all, of this testimony.

¶ 11 The jury convicted Herdman as charged, and he now appeals, raising various statutory, evidentiary, and constitutional issues.

## II. Applicable Standards of Review

¶ 12 Statutory interpretation is a question of law that we review de novo. *People v. Daniels,* 240 P.3d 409, 411 (Colo.App.2009). Our primary purpose in statutory interpretation is to ascertain and give effect to the intent of the General Assembly. *Id.* We first look to the language of the statute, giving words and phrases their plain and ordinary meaning. *Id.* We read words and phrases in context and construe them according to their common usage. *Id.*

¶ 13 In addition, we must interpret a statute in a way that best effectuates the purpose of the legislative scheme. *Id.* When a court construes a statute, it should read and consider the statute as a whole and interpret it in a manner giving consistent, harmonious, and sensible effect to all of its parts. *Id.* In doing so, a court should not interpret the statute so as to render any part of it either meaningless or absurd. *Id.* If the statute is unambiguous, we look no further. *Id.*

¶ 14 We also review de novo the question of whether a statute is constitutional, either on its face or as applied. *People v. Bondurant,* 2012 COA 50, ¶ 11, 296 P.3d 200. A party challenging the constitutionality of a statute bears a heavy burden to demonstrate its unconstitutionality beyond a reasonable doubt. *Id.* at ¶ 12. Generally, a statute is unconstitutional on its face only if the complaining party can show that the law is unconstitutional in all of its applications. *Id.* at ¶ 14. In addition, a facially constitutional statute may be unconstitutional as applied to an individual under the circumstances in which he or she had acted or proposed to act. *Id.*

¶ 15 With respect to Herdman's contentions regarding the evidence that was presented at trial, an objection is sufficient to preserve an evidentiary issue for appeal if the objecting party presents arguments or uses language that alerts the trial court to the impending error. *Am. Fam. Mut. Ins. Co. v. DeWitt,* 218 P.3d 318, 325 (Colo.2009). Thus, an objection on relevance grounds is not necessarily sufficient to preserve an appellate argument that the evidence was unfairly prejudicial. *See id.* at 325–26 (concluding that a relevance objection was insufficient to preserve an unfair prejudice objection where the relevance objection contained no phrases or arguments that could reasonably have been expected to focus the court's attention on concerns about unfair prejudice).

¶ 16 When a defendant has contemporaneously objected to the admission of evidence at trial, we review the contention for harmless error. *People v. Vecellio,* 2012 COA 40, ¶ 53, 292 P.3d 1004. Under this standard, when the error is not of constitutional dimension, we will disregard it as harmless if there is no reasonable probability that it contributed to the defendant's conviction. *Id.* When, however, a defendant has not objected to the admission of evidence at trial, or when he or she objected on grounds different from those asserted on appeal, we review for plain error. *Id.* at ¶ 54. Plain error addresses error that is obvious and substantial and that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *People v. Miller,* 113 P.3d 743, 750 (Colo.2005).

¶ 17 With respect to Herdman's contentions regarding the discovery rules, a conviction will not be reversed for failure to comply with such rules absent a demonstra-

tion of prejudice. *People v. Brown,* —— P.3d ——, ——, 2011 WL 3332314 (Colo.App. 2011).

### III. Admissibility of the Prosecution Experts' Testimony

¶ 18 Herdman principally contends that the trial court reversibly erred in admitting testimony of the prosecution's above-described experts because such testimony (1) was inconsistent with the statutory scheme concerning the admissibility of such evidence; (2) violated his privilege against self-incrimination; and (3) was irrelevant and otherwise inadmissible under CRE 401 to 404. We are not persuaded.

### A. Admissibility Under the Applicable Statutes

#### 1. The Statutory Scheme

¶ 19 Section 16–8–107(1)(a), C.R.S.2011, provides, in pertinent part:

> Except as provided in this subsection (1), no evidence acquired directly or indirectly for the first time from a communication derived from the defendant's mental processes during the course of a court-ordered examination under section 16–8–106[, C.R.S.2011,] or acquired pursuant to section 16–8–103.6[, C.R.S.2011,] is admissible against the defendant on the issues raised by a plea of not guilty, if the defendant is put to trial on those issues, *except to rebut evidence of his or her mental condition introduced by the defendant to show incapacity to form a culpable mental state*
>  . . . .

(Emphasis added.)

¶ 20 This provision allows the prosecution to introduce evidence developed in the course of, among other things, a court-ordered examination to rebut mental condition evidence introduced by the defendant to show incapacity to form a culpable mental state. For purposes of this provision, the phrase "evidence of his or her mental condition introduced by the defendant to show incapacity to form a culpable mental state" refers to that portion of the current definition of "insanity" that formerly constituted the affirmative defense of impaired mental

condition. *See* §§ 16–8–101.3, 16–8–101.5(1)(b), C.R.S.2011; *see also People v. Flippo,* 159 P.3d 100, 105 (Colo.2007) (describing section 16–8–107(1)(a) as "addressing a court-ordered psychiatric examination to determine a defendant's mental condition of insanity"). Thus, section 16–8–107(1)(a) allows the prosecution to introduce evidence acquired in a court-ordered examination to rebut a defendant's evidence of his or her impaired mental condition.

¶ 21 Section 16–8–107(1.5)(a), C.R.S.2011, provides, in pertinent part:

> Except as otherwise provided in this subsection (1.5), evidence acquired directly or indirectly for the first time from a communication derived from the defendant's mental processes during the course of a court-ordered examination pursuant to section 16–8–106 or acquired pursuant to section 16–8–103.6 *is admissible only as to the issues raised by the defendant's plea of not guilty by reason of insanity,* and the jury, at the request of either party, shall be so instructed; except that . . . *such evidence shall also be admissible as to the defendant's mental condition if the defendant undergoes the examination because the defendant has given notice pursuant to subsection (3) of this section that he or she intends to introduce expert opinion evidence concerning his or her mental condition.*

(Emphasis added.)

¶ 22 Section 16–8–107(3)(b), in turn, provides, in pertinent part:

> Regardless of whether a defendant enters a plea of not guilty by reason of insanity pursuant to section 16–8–103, [C.R.S.2011,] the defendant shall not be permitted to introduce evidence in the nature of expert opinion concerning his or her mental condition without having first given notice to the court and the prosecution of his or her intent to introduce such evidence and without having undergone a court-ordered examination pursuant to section 16–8–106.

¶ 23 Thus, section 16–8–107(1.5)(a) allows the prosecution to introduce evidence developed in the course of, among other things, a court-ordered examination when such evi-

dence pertains to (1) the issues raised by a defendant's plea of not guilty by reason of insanity, or (2) a defendant's mental condition, if he or she undergoes an examination after giving notice pursuant to section 16–8–107(3), C.R.S.2011, that he or she intends to introduce expert opinion evidence concerning his or her mental condition. Accordingly, although Herdman is correct that section 16–8–107(3) principally concerns defense experts, he ignores the facts that this provision triggers a compulsory examination and that the second exception contained in section 16–8–107(1.5)(a) allows for the admissibility of certain information derived from that examination.

¶ 24 As to this second exception, the People suggest, and we agree, that the plain language of section 16–8–107(1.5)(a) allows for the admission of evidence acquired for the first time from a communication derived from a defendant's mental processes only when such evidence was acquired during the course of a court-ordered examination conducted as a result of the defendant's having given notice pursuant to section 16–8–107(3)(b).

¶ 25 Moreover, contrary to Herdman's argument that the term "mental condition," as used in section 16–8–107(1.5)(a) and (3)(b), refers solely to insanity, our supreme court and divisions of this court have construed that term more broadly. *See, e.g., People v. Wilburn,* 2012 CO 21, ¶¶ 28–29, 272 P.3d 1078, 1083–84 (concluding that a defendant's learning disability, which did not rise to the statutory level of a mental disease or defect that required an insanity plea, constituted a "mental condition" for purposes of triggering the requirements of section 16–8–107(3)(b)); *Flippo,* 159 P.3d at 104–05 (concluding that "mental condition," as used in section 16–8–107(3)(b), unambiguously includes a defendant's intellectual disability, even though such disability did not rise to the level of insanity); *Bondurant,* ¶ 37 (in rejecting the defendant's contention that section 16–8–107(3)(b) was unconstitutionally vague, the division concluded that the statutory scheme was sufficient to put the defendant on notice that evidence of his clinical depression, anxiety disorder, and multiple personality disor-

der was "mental condition" evidence that exposed him to compulsory examination and cooperation requirements).

¶ 26 Accordingly, we view the evidence that Herdman introduced in support of his involuntary intoxication defense, which included opinions that Herdman "was losing it" and "[didn't] control his thoughts," and that "drug-induced toxicity" can escalate to a psychotic episode in which a person does not do things knowingly, was "mental condition" evidence.

## 2. Application

¶ 27 Here, as noted above, Herdman withdrew his plea of not guilty by reason of insanity. Accordingly, section 16–8–107(1)(a) and the first exception to the inadmissibility rule set forth in section 16–8–107(1.5)(a), both of which are triggered by claims of insanity, as currently defined, do not apply.

¶ 28 Thus, the question becomes whether the testimony of the sanity expert, the competency expert, and the bond expert was admissible under that portion of section 16–8–107(1.5)(a) allowing for the admission of evidence acquired during the course of a court-ordered mental health examination conducted as a result of the defendant's having given notice pursuant to section 16–8–107(3)(b). (Although the People also suggest that the testimony at issue was admissible under section 16–8.5–108, C.R.S.2011, that section is inapplicable because it did not become effective until after Herdman's trial.) We conclude that the evidence was admissible under section 16–8–107(1.5)(a).

¶ 29 As noted above, neither the sanity examiner, the competency examiner, nor the bond examiner conducted his or her examination as a result of Herdman's notice that he intended to introduce expert opinion evidence concerning his mental condition. At a hearing in which Herdman pressed the prosecutor to disclose the experts whom she intended to call in response to Herdman's notice, however, the prosecutor expressly stated that she would call the three experts at issue, all of whom would testify in accordance with their previously produced reports, to rebut the testimony identified in Herdman's expert disclosures.

¶ 30 In our view, the prosecutor's representation was sufficient to satisfy the substantive requirements of section 16–8–107(1.5)(a), the obvious purpose of which is to ensure that the prosecution is given a fair opportunity to rebut mental condition evidence to be presented by a defendant. *See Gray v. Dist. Court*, 884 P.2d 286, 291 (Colo. 1994) (noting that the General Assembly's purpose in requiring court-ordered psychiatric examinations when a defendant puts his or her mental condition in issue was both to prevent defendants from manipulating the system and to find the truth); *Bondurant*, ¶ 22 (noting that the rationale of full disclosure described in *Gray* applies when defendants raise other mental conditions to aid in their defense). Moreover, in the particular circumstances of this case, we agree with the People that it would elevate form over substance to hold that the experts at issue were required to conduct additional examinations for the sole purpose of reissuing their prior reports. Indeed, Herdman does not appear to contend otherwise.

■ ¶ 31 In addition, contrary to Herdman's assertions in his briefs and at oral argument, we do not perceive the prosecution experts' testimony to have amounted to improper opinions that Herdman possessed the requisite mens rea for the crimes charged at the time of the offense. To the contrary, as noted above, Herdman introduced expert testimony that because of his involuntary intoxication, he "was losing it," "[did not] control his thoughts," and suffered from drug-induced toxicity that could escalate to a psychotic episode in which a person would not do things knowingly. The prosecution experts merely responded to such testimony, contending, among other things, that Herdman lacked the typical symptoms of Lariam-induced toxicity, instead exhibited symptoms of cocaine-induced intoxication, and, as his conduct at the time showed, was not unable to control his thoughts or act knowingly.

¶ 32 For these reasons, we conclude that the testimony of the sanity examiner, the competency examiner, and the bond examiner satisfied the requirements of section 16–8–107(1.5)(a).

¶ 33 *People v. Garcia*, 113 P.3d 775 (Colo. 2005), on which Herdman relies, is not to the contrary. Although *Garcia* made clear that "[d]ue to the temporary nature of intoxication, no psychiatric examination of the defendant is statutorily mandated," *id.* at 783, here, Herdman chose to designate an expert pursuant to section 16–8–107(3)(b) to support his involuntary intoxication defense. For the reasons set forth above, this disclosure triggered the requirements of section 16–8–107(1.5)(a) and the prosecution's right to introduce rebuttal evidence.

## B. Privilege Against Self–Incrimination

■ ¶ 34 Herdman next contends that the admission of the prosecution experts' testimony violated his privilege against self-incrimination. We are not persuaded.

■ ¶ 35 As an initial matter, we acknowledge the People's contention that Herdman failed to preserve this argument in the trial court. Prior to trial, however, Herdman filed several motions to preserve his constitutional rights, arguing that if he were to present expert testimony on his mental state without pleading not guilty by reason of insanity, then the prosecution would be barred by the privilege against self-incrimination, among other things, from presenting evidence obtained from the court-ordered examinations. Although this assertion did not specifically address the defense of involuntary intoxication and was couched in terms of seeking guidance from the court with respect to the court's interpretation of sections 16–8–103.6, 16–8–106, and 16–8–107, the argument that Herdman made is substantively the same as the argument that he is now making on appeal. Accordingly, we conclude that Herdman sufficiently preserved this issue and thus turn to the merits of his contention.

¶ 36 As a division of this court has held, "the privilege against self-incrimination is not implicated by a court-ordered mental examination when the information obtained therefrom is admitted only on the issue of mental condition." *People v. Herrera*, 87 P.3d 240, 245 (Colo.App.2003). Although the *Herrera* division arguably limited its analysis to the situation in which the defendant raised an insanity defense by virtue of his incapacity to

form the requisite mental state, *id.*, another division recently applied the *Herrera* analysis to circumstances like those present here, in which a defendant raised the issue of his or her mental condition without pleading insanity. *Bondurant*, ¶¶ 44–46. In those circumstances, the *Bondurant* division reasoned, section 16–8–107(1) and (1.5) preserve defendants' privileges against self-incrimination by limiting the admission of information obtained in court-ordered examinations to those issues of mental condition and insanity that defendants themselves have raised. *Id.* at ¶ 46.

¶ 37 This reasoning is similar to that which applies under the analogous framework governing mental condition evidence in federal court. Specifically, in federal court, if a defendant presents expert evidence of his mental condition, then the prosecution may respond by presenting evidence obtained from the defendant's court-ordered mental health examinations. *See* Fed.R.Crim.P. 12.2(b), (c)(4). This procedure was designed to protect a defendant's privilege against self-incrimination. *See* 1A Charles Alan Wright & Andrew D. Leipold, *Federal Practice & Procedure: Criminal* § 207, at 500–01 (4th ed. 2008) ("As with a notice of an insanity defense, defendant's statements made during mental examination conducted under Rule 12.2, the fruits of those statements, and expert testimony based on those statements, are not admissible at trial unless the defendant introduces evidence on the subject first.... [T]his protection was added by Congress when the rule was first adopted to avoid intruding on defendant's Fifth Amendment privilege against self incrimination.") (footnote omitted).

¶ 38 Here, not only did Herdman give notice that he intended to present expert testimony concerning his mental condition, but also he actually presented such testimony at trial. In these circumstances, we are persuaded by the *Bondurant* division's analysis and thus conclude that the admission of the prosecution experts' testimony, which was responsive to Herdman's expert evidence, did not violate Herdman's privilege against self-incrimination. *See Bondurant*, ¶¶ 44–46.

## C. Rule–Based Challenges to Prosecution Experts

¶ 39 Herdman next asserts that the testimony of the sanity examiner, the competency examiner, and the bond examiner was irrelevant under CRE 401 and 402 and was otherwise inadmissible under CRE 403 and 404. Specifically, he contends that these experts' testimony regarding his cocaine use, psychopathy, lack of empathy or remorse, narcissism, and malingering amounted to evidence of bad character offered to show that he acted in conformity with such bad character during the time frame at issue. He further argues that the evidence regarding his cocaine use was admitted in violation of the court's orders (1) limiting the scope of such evidence to cocaine use immediately prior to the events at issue and (2) requiring the prosecution to request a bench conference before introducing any such evidence. And he asserts that the bond examiner's risk assessment evidence was irrelevant and highly prejudicial. We perceive no reversible error.

### 1. Applicable Evidence Rules

¶ 40 CRE 401 defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Irrelevant evidence is inadmissible. CRE 402.

¶ 41 CRE 403 allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 42 Under CRE 404(a), subject to certain exceptions not applicable here, evidence of a person's character or a trait of his or her character is not admissible to prove that he or she acted in conformity therewith on a particular occasion. *See also People v. Griffin*, 224 P.3d 292, 296 (Colo.App.2009) ("[W]hen the prosecution seeks to admit any evidence which suggests that the defendant is a person of bad character, ... it must be prepared to explain why the logical relevance

of that evidence does not depend on the inference that the defendant acted in conformity with his bad character.").

¶ 43 And under CRE 404(b), the admissibility of evidence of other crimes, wrongs, or acts is determined by applying a four-step test. *People v. Spoto,* 795 P.2d 1314, 1318 (Colo.1990); *see also Yusem v. People,* 210 P.3d 458, 463 (Colo.2009). First, the evidence must relate to a material fact, which is a fact that is of consequence to the determination of the action. *Yusem,* 210 P.3d at 463. Second, the evidence must be logically relevant, meaning that it must have some tendency to make the existence of a material fact more probable or less probable than it would be without the evidence. *Id.* Third, the logical relevance must be independent of the prohibited intermediate inference that the defendant committed the crime charged because of the likelihood that he or she acted in conformity with his or her bad character. *Id.* And fourth, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *Id.*

### 2. Cocaine Use

¶ 44 Regarding Herdman's cocaine use, as noted above, Herdman's defense at trial was that he was involuntarily intoxicated due to the effects of Lariam. The prosecution experts opined to the contrary, stating, among other things, that the use of crack cocaine has been associated with other sexual assaults, and that *voluntary* cocaine intoxication was "far and away" the most likely explanation for any "perturbations" to Herdman's mental state on the date of the crime at issue. Accordingly, the evidence concerning Herdman's use of cocaine was not offered to show Herdman's bad character or any propensity to act in accordance with any bad character, but rather was offered to rebut his claim of involuntary intoxication, and the court gave a limiting instruction advising the jurors that they could consider Herdman's cocaine use only for that purpose. In these circumstances, we perceive no error in the admission of such evidence. *See People v. Gonzales–Quevedo,* 203 P.3d 609, 612 (Colo. App.2008) (noting that in rebuttal to an in-

sanity defense, "the prosecution may properly present alternative explanations of a defendant's behavior"); *see also People v. Marsh,* —— P.3d ——, ——, 2011 WL 6425492 (Colo.App.2011) ("Jurors are presumed to follow instructions given to them by the trial court.").

¶ 45 In light of the foregoing, for two reasons, we likewise perceive no reversible error in the prosecution's failure to request a bench conference until after introducing evidence regarding Herdman's cocaine use. First, it appears that the initial reference to any cocaine use by Herdman prior to the crime at issue was made on direct examination by Herdman's own expert, who had been called out of order for scheduling reasons. The prosecution then properly pursued that issue on cross-examination. Second, although the prosecution did not request a bench conference until the next day, the court ruled that such evidence was admissible. Accordingly, we perceive no prejudice to Herdman from the prosecution's arguably belated request for a bench conference.

¶ 46 Nor are we persuaded that evidence regarding Herdman's cocaine use years before the incident at issue warrants reversal. The record reveals that the references to such cocaine use were few, fleeting, and not detailed, and they were blurted out by witnesses despite being nonresponsive to the questions asked. *See People v. Mapps,* 231 P.3d 5, 12 (Colo.App.2009) (noting, under a plain error standard, that a witness's improper reference to a search warrant did not require reversal, where the reference was minimal, the witness provided little detail about the process of applying for and obtaining a search warrant, and the prosecutor did not reference the statements in closing argument). Moreover, Herdman did not move to strike such references or request an additional limiting instruction.

¶ 47 For these reasons, we conclude that the admission of evidence regarding Herdman's cocaine use does not warrant reversal.

### 3. Psychopathy, Lack of Empathy or Remorse, Narcissism, and Malingering

¶ 48 Regarding the prosecution experts' testimony as to Herdman's psychopa-

thy, lack of empathy or remorse, narcissism, and malingering, we conclude that such evidence was not offered to show Herdman's bad character, but rather was offered to rebut his claims of involuntary intoxication and amnesia.

¶ 49 Specifically, evidence of Herdman's psychopathy was relevant to rebut his contention that his conduct was due to involuntary intoxication, because such evidence offered an alternative explanation for his conduct. *See Gonzales–Quevedo,* 203 P.3d at 612–13 (holding that the prosecution could rebut a defendant's insanity defense with evidence that he suffered not from insanity, but from antisocial personality disorder); *Harris v. State,* 84 P.3d 731, 746 (Okla.Crim.App.2004) (when a defendant's experts testified to his impaired mental functioning and ultimately opined that the defendant was unable to form the specific intent to kill, the prosecution properly rebutted such evidence with evidence of the defendant's psychopathy, which tended to show that his behavior was not the result of a diminished mental capacity, but rather was the product of a generally violent personality for which he should be held accountable).

¶ 50 Likewise, evidence of Herdman's lack of empathy, lack of remorse, and narcissism was offered (1) to show that Herdman was not involuntarily intoxicated due to Lariam, because, as Herdman's own experts indicated, people suffering from Lariam toxicity are typically shocked and appalled by their conduct, and (2) to rebut Herdman's assertion that he suffered amnesia and did not know what he had done. *See People v. Martinez,* 74 P.3d 316, 325 (Colo.2003) (noting that intent can be proved by circumstantial evidence, including a defendant's lack of remorse).

¶ 51 And evidence of Herdman's malingering provided another alternative explanation for Herdman's assertion that Lariam made him psychotic. *See Gonzales–Quevedo,* 203 P.3d at 612; *see also People v. Henney,* 334 Ill.App.3d 175, 267 Ill.Dec. 681, 777 N.E.2d 484, 495 (2002) (noting that a prosecution expert's testimony that the defendant was malingering was proper because it tended to

show that the defense expert's contrary conclusion may have been erroneous).

### 4. Risk Assessment

¶ 52 Herdman next contends that the court reversibly erred in allowing the bond examiner to testify, because the bond examiner's testimony was irrelevant and highly prejudicial, and amounted to evidence of Herdman's bad character. We agree with Herdman that this testimony was irrelevant and inadmissible, and thus, we need not address his unpreserved CRE 403 and preserved CRE 404 objections. On the facts of this case, however, we cannot conclude that the admission of the bond examiner's irrelevant evidence mandates reversal.

¶ 53 As noted above, the bond examiner performed a risk assessment to determine whether Herdman would pose a risk to society or a flight risk if he were to be released on bond. Herdman objected to the bond examiner's testifying regarding this assessment, arguing, as pertinent here, that such testimony would not be relevant to Herdman's mental condition during the crime. The prosecution responded that it would guide the bond examiner not to label the examination as a risk assessment and that the testimony would concern Herdman's mental condition during the crime.

¶ 54 The trial court overruled Herdman's objection, reasoning that the bond examiner's opinion, although based on an examination conducted after the crime, could be relevant to Herdman's mental condition during the crime. The court, however, invited defense counsel to make contemporaneous objections to particular questions posed to the bond examiner as appropriate.

¶ 55 The bond examiner then testified to, among other things, Herdman's "moderate risk of violence," and he noted that because of Herdman's age, he was at a "moderately high risk of repeating" a violent offense like the one at issue here. Herdman did not contemporaneously object to this testimony.

¶ 56 Herdman did, however, object when the prosecutor asked the bond examiner questions regarding Herdman's "relationship instability" score on the risk assessment. At

this point, the court reiterated that the significant time period was the date of the offense and stated, "I trust this witness is going to make an effort to connect his evaluation to that time period. If he doesn't, you can cross-examine him about it."

¶ 57 On cross-examination, however, the bond examiner conceded that none of what he had described related back to Herdman's mental condition at the time of this offense:

Well, this risk assessment that I did wasn't designed to be analyzing his mental state at the time of the offense. It was designed to be a recommendation concerning what was going to happen to him at that particular time that I did the assessment.... Now a lot of risk factors that I reviewed did refer to a historical fact. Some of them went back years and years. But they weren't specifically referenced to the time of the offense.

¶ 58 The next day, Herdman moved to strike the bond examiner's testimony, arguing that the testimony "had really nothing to do with Mr. Herdman's state of mind at the time of the offense," which the bond examiner had, in fact, conceded. Herdman further asserted that the bond examiner's testimony "was offered to show more of character evidence against Mr. Herdman than it was to offer what his state of mind was on July 31." The court, however, denied the motion to strike. Although the court apparently agreed that the testimony was irrelevant, it found that "the cross-examination where the witness acknowledged that he was unable to connect it back to July 31, 2003, is in itself a sufficient remedy."

¶ 59 We conclude that the trial court erred in admitting the bond examiner's testimony. As Herdman asserts, the examiner conceded that his risk assessment was not designed to analyze Herdman's mental state at the time of the offense and that the risk factors did not reference the time of the offense. The relationship of the examiner's testimony to the time of the offense, however, was the sole basis on which the court admitted this evidence. Accordingly, this evidence was irrelevant, should not have been admitted in the first instance, and should have been stricken on Herdman's motion.

¶ 60 The question thus becomes whether the erroneous admission of this testimony was harmless. Although we perceive this issue as close, for two reasons we conclude that it was.

¶ 61 First, we note that most of the bond examiner's testimony was cumulative to that of the other experts. Moreover, the court gave a limiting instruction, advising the jury that any mental condition evidence that it heard was relevant only to Herdman's mental condition on the date of the offense at issue, and we must presume that the jury followed the court's instruction and thus discounted the bond examiner's testimony accordingly. *See Marsh,* —— P.3d at ——.

¶ 62 Second, although we are troubled by the bond examiner's references to his "risk assessment" and by his conclusion that Herdman presented a moderate risk of repeating a violent offense like the one at issue, these references were fleeting and unexplained, and they comprised a very small part of otherwise lengthy testimony. Moreover, these references were arguably consistent with other expert testimony that the jury properly heard (e.g., the testimony concerning Herdman's psychopathy), and the prosecution did not mention this testimony again, including in its closing argument.

¶ 63 For these reasons, we conclude that the improper admission of the bond examiner's testimony does not warrant reversal.

### III. Sergeant Gallegos' Testimony

¶ 64 Herdman next contends that the trial court reversibly erred in allowing Sergeant Gallegos to testify that (1) Herdman did not serve in Iraq; (2) he did not have PTSD; and (3) his behavior after his return from overseas was "rebellious." We disagree.

### A. Service in Iraq

¶ 65 Herdman asserts that the trial court erred in allowing Sergeant Gallegos to testify that Herdman had never been in Iraq because (1) such testimony was not previously disclosed, in violation of the applicable discovery rules, and (2) it was hearsay. We perceive no prejudice from any discovery

violation. Moreover, although we agree that the testimony was inadmissible hearsay, we conclude that any error was harmless.

¶ 66 Sergeant Gallegos testified that he knew that Herdman had not served in Iraq because his battalion sergeant major told him that. Herdman objected to this testimony, contending that the prosecution had not disclosed this testimony and that it was hearsay. The trial court found no discovery violation, because Herdman's counsel had interviewed Sergeant Gallegos before trial. It also rejected Herdman's hearsay objection on the ground that the testimony was admissible under the business record exception to the hearsay rule, CRE 803(6), notwithstanding the fact that Sergeant Gallegos proffered no document in connection with this testimony.

¶ 67 With respect to the alleged discovery violation, assuming without deciding that the prosecution was required to disclose this testimony in advance, we perceive no prejudice. Herdman introduced documentary evidence demonstrating his service in Iraq, and he makes no argument as to what he would have done differently had Sergeant Gallegos' testimony been disclosed earlier.

¶ 68 With respect to the hearsay objection, we conclude that Sergeant Gallegos' testimony was clearly hearsay, because he merely repeated what someone else had told him. CRE 801(c) (defining "hearsay"). Moreover, the People concede, and we agree, that the business record exception is inapplicable here, because Sergeant Gallegos did not offer any business record on this point. Accordingly, Sergeant Gallegos' testimony that Herdman did not serve in Iraq was inadmissible hearsay. CRE 802 (hearsay rule).

¶ 69 The question thus becomes whether the admission of this hearsay testimony was harmless. We conclude that it was.

¶ 70 Although we acknowledge that Herdman has argued that false testimony regarding military service in Iraq might have a particular impact on an El Paso County jury (or, in our view, on any jury), in this case Herdman presented substantial evidence, including documentary evidence, of his service in Iraq, and Sergeant Gallegos' contrary testimony appears to have stood alone. In these circumstances, we cannot say that there is a reasonable probability that the erroneous admission of this hearsay testimony contributed to Herdman's conviction.

### B. PTSD

¶ 71 Herdman further contends that Sergeant Gallegos' testimony that Herdman did not suffer from PTSD was (1) improper lay opinion, in violation of CRE 701, and (2) improper testimony regarding Herdman's veracity on a particular occasion, in violation of CRE 608(a). Herdman did not preserve either of these objections. Accordingly, we review for plain error and perceive none.

¶ 72 Under CRE 701, lay witnesses may offer opinion testimony if their opinions are rationally based on their perception, helpful to a clear understanding of their testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of CRE 702. Here, even if Sergeant Gallegos' testimony was improper lay opinion, we perceive no plain error, because experts on both sides testified as to whether Herdman suffered from PTSD, and most of Sergeant Gallegos' testimony amounted to his personal observations of Herdman's conduct, which were the proper subject of lay testimony.

¶ 73 As to Herdman's CRE 608(a) objection, we likewise perceive no plain error. Sergeant Gallegos did not comment on Herdman's veracity on any specific occasion. Rather, as noted above, he principally commented on conduct that he observed, which was relevant to the prosecution's theory that Herdman was malingering.

### C. Rebelliousness

¶ 74 Herdman also contends that Sergeant Gallegos' testimony that Herdman's conduct was rebellious was evidence of bad character, the admission of which violated CRE 404. Herdman did not preserve this objection, and again we perceive no plain error.

¶ 75 In our view, Sergeant Gallegos' characterization of Herdman's conduct as "rebellious" was not obviously bad character evi-

dence. Moreover, the testimony at issue, when read in context, amounted to commentary on behavior that Sergeant Gallegos personally observed and that tended to support the prosecution's theory of malingering.

¶ 76 For these reasons, we perceive no reversible error in the admission of those portions of Sergeant Gallegos' testimony that are at issue here.

## IV. Cumulative Error

¶ 77 Herdman next asserts that, taken together, the foregoing errors warrant reversal. We are not persuaded.

¶ 78 "We will reverse for cumulative error only where, although numerous trial errors individually have been found harmless, in the aggregate those errors prejudiced the defendant's substantial rights and deprived him or her of a fair trial." *People v. Douglas*, 2012 COA 57, ¶ 71, 296 P.3d 234. The doctrine of cumulative error requires that numerous errors be committed, not merely alleged. *People v. Rivers*, 727 P.2d 394, 401 (Colo.App.1986).

¶ 79 Here, we have not identified numerous trial errors. Nor can we say that the errors that we have identified, when considered in the aggregate, prejudiced Herdman's substantial rights and deprived him of a fair trial. This is especially true here, where the errors that we have identified were not related to one another. *See State v. Martinez*, 290 Kan. 992, 236 P.3d 481, 499 (2010) (concluding that the combination of two unrelated harmless errors was not so prejudicial as to deny the defendant a fair trial).

¶ 80 Accordingly, we conclude that the cumulative effect of any trial errors here does not require reversal of Herdman's convictions.

## V. Sufficiency of the Evidence

¶ 81 Herdman next contends that the evidence presented was insufficient to support his convictions for sexual assault and the crime of violence sentence enhancer, because, he says, there was no evidence that he used a deadly weapon to cause submission of the victim. We disagree.

¶ 82 "When assessing the sufficiency of the evidence in support of a guilty verdict, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt." *People v. Sprouse*, 983 P.2d 771, 777 (Colo.1999).

¶ 83 As pertinent here, sexual assault is a class 2 felony if the defendant is "armed with a deadly weapon .... and uses the deadly weapon ... to cause submission of the victim." § 18–3–402(5)(a)(III), C.R.S.2011. Similarly, a sexual assault like that at issue here is a crime of violence when, during or in immediate flight from the assault, the defendant "[u]sed, or possessed and threatened the use of, a deadly weapon." § 18–1.3–406(2)(a)(I)(A), C.R.S.2011.

¶ 84 At trial, the prosecution presented evidence that Herdman showed the victim his knife, threatened to cut her if she did not do as he said, ordered her to an apartment, put the knife beside the bed where she could see it, and then sexually assaulted her.

¶ 85 We conclude that such evidence was more than sufficient to allow a reasonable jury to conclude that Herdman used, possessed, or threatened to use a deadly weapon and that he then used the weapon to cause the victim's submission to the sexual assault. *See People v. Hines*, 780 P.2d 556, 559 (Colo. 1989) (holding that "use" of a deadly weapon, for purposes of felony menacing, "is broad enough to include the act of holding the weapon in the presence of another in a manner that causes the other person to fear for his safety").

## VI. Double Jeopardy

¶ 86 Herdman contends that his sex assault conviction must merge into his kidnapping conviction because the former is a lesser included offense of the latter. We again disagree.

¶ 87 Herdman's argument rests on the premises that (1) a defendant's sentence for second degree kidnapping is enhanced when the person kidnapped is a victim of, among other offenses, a sexual assault, § 18–3–

302(3)(a), C.R.S.2011, and (2) a sentence enhancer like this is a substantive element of an offense.

¶ 88 Contrary to Herdman's argument, our supreme court has recently rejected the contention that a sentence enhancer is a substantive element of an offense for purposes of double jeopardy analysis. *See People v. Simon,* 266 P.3d 1099, 1109 (Colo.2011).

¶ 89 Accordingly, Herdman's double jeopardy argument fails.

## VII. Correction of the Mittimus

¶ 90 Finally, Herdman contends, the People concede, and we agree that the mittimus must be corrected to reflect a sentence of eight years for kidnapping, not eight years to life. We further agree with the People that the references in the mittimus to "mandatory parole" and "5–19–08 20 years to life parole" should be stricken and that the mittimus should be corrected to provide that parole is determined under section 18–1.3–1006(1)(b), C.R.S.2011. *See People v. Tucker,* 194 P.3d 503, 504 (Colo.App.2008).

¶ 91 Herdman also contends that the mittimus must be corrected to reflect 1,021 days of presentence confinement credit. The People respond that we should remand this issue for a hearing because, with Herdman serving sentences in both Colorado and New York, the trial court took under advisement the issue of the precise number of days of presentence confinement credit to which Herdman was entitled but then never addressed that issue.

¶ 92 Because the question of presentence confinement may require further factual development, we agree with the People that a remand on this issue is necessary and appropriate. *See People v. Roberts,* 179 P.3d 129, 134 (Colo.App.2007) (remanding to the trial court for a determination as to whether the defendant was entitled to additional presentence confinement credit), *aff'd,* 203 P.3d 513 (Colo.2009). We leave to the trial court's discretion how best to proceed to determine the presentence confinement credit to which Herdman is entitled.

## VIII. Conclusion

¶ 93 For these reasons, the judgment is affirmed, and the case is remanded for correction of the mittimus and determination of the proper amount of presentence confinement credit to which Herdman is entitled.

Judge ROMÁN and Judge BERNARD concur.